Quentin H. HUNTER, Appellee,

v.

The BOARD OF TRUSTEES OF BROAD-LAWNS MEDICAL CENTER and Jeanne F. Miller, Margaret A. Stout, John D. Ahern, William L. Jacobs, Katheryn Freilinger, Mary Fuller, William E. Tabor, Doug Hart, William Dyar, Carol Romine, and William L. Meyer, Appellants.

No. 90–1078.

Supreme Court of Iowa.

Jan. 22, 1992.

Rehearing Denied Feb. 19, 1992.

As Amended March 20, 1992.

James L. Sayre of Sayre & Gribble, P.C., and David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellants.

John G. Black of Black, Goldman & Powell, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and SNELL, JJ.

SNELL, Justice.

The appellants, the Board of Trustees of Broadlawns Medical Center (BMC), and William L. Meyer, the former executive director of BMC, appeal an adverse judgment rendered in favor of a former BMC employee, Quentin H. Hunter, the appellee herein. Hunter alleged that the termination of his employment was in violation of his employment contract with BMC. He further alleged that Meyer tortiously interfered with that contract and directly brought about its wrongful termination. After a jury verdict in favor of Hunter, the district court entered judgment in the amount of $521,462 against the trustees and in the amount of $173,821 against Meyer. Additional counsel for appellants, David L. Brown, joined for post trial and appellate proceedings. We now affirm the trial court's decision in all respects.

Hunter was hired by BMC in 1974 by the then-current Executive Director, Charles Ingersoll. From that date until 1977, he served as the Director of the Alcoholism Department. In 1977, he was appointed to the position of Broadlawns Director and Associate Executive Director. As Broadlawns Director, he reported directly to the Executive Director of the hospital. The position of Associate Executive Director required Hunter to serve as acting Executive Director whenever that need should arise. Except for his first year with BMC, Hunter had no individualized contract of employment.

In 1984, BMC approved and circulated a manual of personnel policies (MPP). Although the manual addresses a variety of personnel matters, the only sections relevant to the instant dispute are sections XIII and XVIII. Section XIII reads, in pertinent part, as follows:

XIII. *SEPARATION OF EMPLOYMENT*

A. *POLICY:* BROADLAWNS MEDICAL CENTER STRIVES TO PROVIDE AN ORDERLY EXIT PROCESS FOR EMPLOYEES WHO ARE SEPARATED FROM EMPLOYMENT THROUGH RESIGNATION, RETIREMENT OR WHO ARE DISCHARGED FOR

CAUSE. *THE EMPLOYEE'S LAST DAY WORKED IS THE EFFECTIVE DATE OF SEPARATION.* BROADLAWNS MEDICAL CENTER REGRETS THE LOSS OF SERVICES OF AN EMPLOYEE, BUT IT IS UNDERSTANDABLE THAT SEPARATIONS OF EMPLOYEES OCCUR. THE TYPES OF SEPARATIONS ARE:

1. *VOLUNTARY RESIGNATION:* EMPLOYEE–INITIATED SEPARATION WITH PROPER NOTICE.

2. *VOLUNTARY QUIT:* EMPLOYEE–INITIATED SEPARATION WITHOUT PROPER NOTICE.

3. *RETIRED:* AT EMPLOYEE'S OR BROADLAWNS MEDICAL CENTER'S REQUEST.

4. *THREE (3) DAY QUIT:* EMPLOYEE FAILED TO REPORT TO WORK FOR THREE CONSECUTIVE DAYS WITHOUT NOTIFYING IMMEDIATE SUPERVISOR, THEREFORE, EMPLOYEE IS CONSIDERED TO HAVE ABANDONED POSITION.

5. *EXPIRED LEAVE:* FAILURE OF EMPLOYEE TO REPORT TO WORK AT THE END OF AN AUTHORIZED UNPAID LEAVE OF ABSENCE.

6. *DISCHARGED:* BROADLAWNS MEDICAL CENTER INITIATES SEPARATION FOR CAUSE.

7. *STAFF REDUCTION:* BROADLAWNS MEDICAL CENTER INITIATES EMPLOYEE LAY OFF TO REDUCE STAFF WHEN DEEMED NECESSARY.

. . . .

B. *PROCEDURES:*

. . . .

7. *STAFF REDUCTION:* BROADLAWNS MEDICAL CENTER MAY AT ITS SOLE DISCRETION LAYOFF AN EMPLOYEE WHENEVER IT IS DEEMED NECESSARY. SEPARATION BY REDUCTION IN FORCE WILL BE ACCOMPLISHED IN A SYSTEMATIC MANNER. (SEE SECTION XVIII. *STAFF REDUCTION*).

Section XVIII, which is entitled "Staff Reduction—General Policy Statement," outlines a detailed procedure for determining which employees will be subject to separation as a result of any given staff reduction. The section XVIII procedures include a ranking system, based on performance evaluations and years of service, as well as an in-house appeals process for contesting separation decisions.

The next event of significance was the retirement of Charles Ingersoll in 1987. BMC filled the vacant post of executive director by hiring William L. Meyer, one of the appellants, on January 1, 1987. One month after assuming the position of executive director, Meyer terminated Hunter's employment, purportedly pursuant to a "staff reduction" as described in section XIII A.7 of the MPP. Approximately two months after Hunter's termination, Meyer created a new position styled "Director of Professional and Support Services" and filled this position with a former coworker from Kansas, Orlin "Chick" Cunningham.

Hunter challenged his discharge of employment by filing suit for breach of contract by BMC and tortious interference with a contractual relationship on the part of Meyer. Prior to trial, both parties moved for summary judgment. The trial judge ruled as a matter of law that the MPP constituted a binding employment contract between BMC and Hunter. The court concluded that the contract limited BMC's right to terminate an employee to one of the seven events described in section XIII A. of the MPP. The remaining issues—whether BMC breached that contract in terminating Hunter's employment and whether Meyer tortiously interfered with the contract—were tried before a jury.

In support of his position that BMC breached the employment contract, Hunter offered the testimony of Professor Ira Dolich, Ph.D, former dean of the College of Business and Public Administration at Drake University. Professor Dolich opined that Hunter's former position as Broadlawn's Director was not truly eliminated as would be the case with a true "staff reduction." Instead, Professor Dolich concluded that Hunter's former position was merely retitled from "Broadlawn's Director" to "Director of the Division of Professional

and Support Services," a position then held by Meyer's former coworker from Kansas, Orlin "Chick" Cunningham.

The jury apparently accepted Professor Dolich's characterization of the facts and, accordingly, rendered a verdict charging BMC with breach of contract. As noted above, a verdict in favor of Hunter was also returned on the tortious interference with a contractual relationship claim.

BMC and Meyer seek reversal of the judgments entered against them on the basis of four asserted errors. First, they argue that the question as to whether the MPP constitutes a contract should not have been decided as a matter of law. In a related contention, appellants maintain that, even if the decision was properly decided as a matter of law, the conclusion that the MPP constitutes a contract is erroneous. Second, appellants assert that, if the MPP does give rise to a contract between Hunter and BMC, damages for future wages were not appropriate. In appellants' third asserted error, they argue that Hunter's claim for tortious interference with a contractual relationship should fail given that the alleged tortfeasor was an agent of the party in breach; it is also claimed that Hunter's recovery in the tort action is duplicative of the award given in the breach-of-contract action. Finally, appellants challenge the admissibility of the testimony given by Hunter's expert witness, Professor Dolich.

Our review of these complaints is for correction of errors at law. Iowa R.App.P. 4. The trial court's summary judgment ruling that found the MPP to be a contract as a matter of law will be affirmed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ.P. 237(c).

## I. *Employment Contract.*

■ The central issue presented by this dispute is whether BMC's issuance of the MPP transformed Hunter's employment relationship from one that was terminable at will to one that was terminable only for one of the reasons enumerated under section XIII A. of the MPP. That is, was Hunter's position with BMC secured by contractual obligations and duties as memorialized in the MPP, or did he serve at the pleasure of his employer? To the extent that Hunter's continued employment at BMC was subject to BMC's discretion, there would, by definition, be no contractual relationship. *See* A. Corbin, *Contracts* § 96, at 417–18 (1950) (where parties agree that performance is terminable at will by either party, the agreement is not a contract at all).

Although the common-law doctrine of employment at will is firmly rooted in Iowa, we have carved out two narrow exceptions. *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989). The exception relevant here is the one that arises when "an employer's handbook or policy manual guarantees an employee that discharge will occur only for cause or certain conditions." *Id.* More specifically, we have recognized that an employee policy manual distributed to employees may constitute an offer by the employer that is then accepted by performance on the part of the employee. *Fogel*, 446 N.W.2d at 456; *McBride v. City of Sioux City*, 444 N.W.2d 85, 90 (Iowa 1989); *Cannon v. Nat'l By–Prods., Inc.*, 422 N.W.2d 638, 640–41 (Iowa 1988); *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626–27 (Minn.1983); *see also Young v. Cedar County Work Activity Ctr.*, 418 N.W.2d 844, 848 (Iowa 1987). The result of this bargaining process is a unilateral contract. *Fogel*, 446 N.W.2d at 456; E. Farnsworth, *Contracts* § 312, at 223 (1990) (when an offeror seeks performance and not a return promise as the desired mode of assent, the result is a unilateral contract). In exchange for the employer's guarantee not to discharge in the absence of cause or certain specified conditions, the employer reaps the benefits of a more secure and presumably more productive work force. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 680, 765 P.2d 373, 387, 254 Cal.Rptr. 211, 225 (1988). The consideration for the bargain arises from the employee remaining on the

job, given that she would otherwise be free to leave at any time. *See Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910, 914 (1991); Note, *Protecting At–Will Employees* 93 Harv. L.Rev. 1816, 1819–20 (1980).

The situation in which an employer promises not to discharge an employee in the absence of cause, or in the absence of one or more enumerated events, has traditionally been distinguished from the scenario in which the employer makes an offer of "permanent employment." As we noted in *Albert v. Davenport Osteopathic Hospital*, 385 N.W.2d 237 (Iowa 1986), a contract for permanent employment has been held to require some additional consideration on the part of the employee beyond merely forbearing from exercising the right to leave his or her job. *Id.* at 238–39. However, as we noted in *Cannon*, this additional requirement for contract formation does not apply where the employer issues a personnel manual that purports to limit the right to discharge an employee to cause or other stipulated events. *Cannon*, 422 N.W.2d at 641–42.

Arguably, an offer of "permanent employment" should be construed, consistent with the reasonable expectations of the parties, as an offer of employment that is terminable only for cause. *See McBride*, 444 N.W.2d at 90 ("[A] unilateral contract of employment may be created when an employer ... give[s] the worker a reasonable understanding of continued employment, and the employer has reason to know of the worker's understanding."); E. Farnsworth, *Contracts* § 7.9, at 255 ("[I]f parties attach different meanings to language, the court's task is ... one of applying a standard of reasonableness to determine which party's intention is to be carried out at the expense of the other's."). In any case, as the MPP does not purport to make an offer of permanent employment, that question is not properly before us, and we need not address it further.

As is true of contract formation in general, the parties to an employment contract must manifest their assent to be bound and do so in a manner that is sufficiently definite to be enforceable. *Fogel*, 446 N.W.2d at 456 ("personnel handbook must be sufficiently definite in its terms to create an offer"); *McBride*, 444 N.W.2d at 91. The Restatement (Second) of Contracts provides that "[w]hether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule." Restatement (Second) of Contracts § 209(2) (1981). In *Young v. Cedar County Work Activity Center, Inc.*, 418 N.W.2d 844 (Iowa 1986), we further noted that "ordinarily, whether a particular writing has been adopted as an integrated agreement is 'a question of fact to be determined in accordance with all relevant evidence.'" *Id.* 418 N.W.2d at 848 (citing Restatement (Second) of Contracts § 209 comment c (1981)); *McBride*, 444 N.W.2d at 90–91 (handbook may create unilateral contract of employment if expressions contained in handbook, in light of surrounding circumstances, give worker a reasonable understanding of continued employment). Moreover, in *Hamilton v. Wosepka*, 261 Iowa 299, 306, 154 N.W.2d 164, 168 (1967), we concluded that extrinsic evidence that throws light on the situation of the parties is relevant to ascertaining the proper meaning of an agreement.

In the case at hand, Hunter offered a considerable amount of extrinsic evidence in the form of deposition testimony in support of his motion for summary judgment on the issue of whether or not the MPP constitutes an integrated employment agreement. This deposition testimony included statements by Hunter, Broadlawns' managers—including the former Executive Director, Charles Ingersoll—Broadlawns' personnel director, Diane Elliott, and finally the board of trustees themselves. The testimony indicated that all the parties considered the seven reasons for termination listed in the MPP to be a comprehensive list of the reasons for which job termination is authorized to occur and does occur at BMC. The deponents further indicated that Broadlawns' employees reasonably expect and understand that their employment will not be terminated for any reason not on the list of seven. In con-

trast, BMC and Meyer offered no supporting affidavits or deposition testimony concerning the subjective intent of the parties regarding the MPP in support of their resistance to Hunter's summary judgment motion.

Although BMC did not support its resistance to Hunter's motion for summary judgment with affidavits or deposition excerpts, it did later, in an "offer of proof," submit affidavits by BMC trustees which indicated that they did not regard the MPP to be a limitation on their discretion to discharge employees at will. It should be noted that this position was in marked contradiction to the position taken by the trustees in the deposition offered by Hunter at the summary judgment proceedings. However, since these affidavits were not submitted until after the trial court's ruling on the summary judgment motion, they are not properly considered when determining whether the grant of partial summary judgment for Hunter was appropriate. *See* Iowa R.Civ.P. 237(c) ("The adverse party *prior to the day of hearing* may file opposing affidavits.") (emphasis added); *Stockdale, Inc. v. Baker*, 364 N.W.2d 240, 243–44 (Iowa 1985) (affidavits not timely filed under Iowa R.Civ.P. 237 should not be considered); *Neoco, Inc. v. B.C. Christenson*, 312 N.W.2d 559, 560 (Iowa 1981) (district court may properly refuse to reconsider a summary judgment ruling based upon late-filed affidavits). After receiving the offer of proof, the trial judge noted that these documents were not a part of the record at the time of the ruling granting a partial summary judgment to plaintiff and confirmed the ruling.

Since BMC and Meyer failed to support their resistance to Hunter's summary judgment motion with any affidavits, deposition excerpts, or other factual assertions, there was no genuine issue of material fact for a jury to decide, and, therefore, Hunter was entitled to a partial summary judgment as a matter of law. Iowa R.Civ.P. 237(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."); *In re Eickman Estate*, 291 N.W.2d 308, 312 (Iowa 1980) (where resister fails to file opposing affidavits, they take the risk of standing on the record established by the moving party); *Graham v. Kuker*, 246 N.W.2d 290, 291 (Iowa 1976) (where movant sets forth specific facts supporting motion for summary judgment, it is incumbent on resister to "set forth specific facts showing that there is a genuine issue for trial").

In light of the foregoing, we agree with the trial court that the language used was sufficiently definite to manifest the parties' assent to an employment contract that is properly terminable only for one or more of the seven enumerated reasons. In addition, although each case involving a personnel manual must ultimately turn on the particular facts and circumstances surrounding its issuance, we are convinced that this interpretation of BMC's MPP is consistent with the case law in this area. In *Fogel*, we concluded that the policy manual at issue fell short of the definiteness required to constitute an employment contract because the manual explicitly acknowledged the possibility that the employment might be terminated in the absence of cause. *Fogel*, 446 N.W.2d at 456. The manual in *Fogel* stated: "If termination is necessary for reasons not prejudicial to the employee (reasons unrelated to job performance), he/she may expect to receive notice of not less than one month prior to the termination date." *Id.* at 452. This clear reservation of the right to terminate at will stands in marked contrast to the precise terminology found in section XIII A. of the MPP: "The types of separation are: [then proceeding to enumerate seven events that would give rise to discharge]." This language, which is more restrictive and definite than the language in the *Fogel* handbook, is much more like that found in the employee manual at issue in *Cannon*, in which we concluded that a jury could find the manual created a reasonable expectation of contractual employment rights. *Cannon*, 422 N.W.2d at 640. The

relevant language there read: "No employee will be ... dismissed without just and sufficient cause. Sufficient cause shall include, among other reasons, dishonesty, negligence, incompetence, [etc.]" *Id.* at 639. Our conclusion is also consistent with decisions of other jurisdictions. *See, e.g., Butterfield v. Citibank of South Dakota, N.A.,* 437 N.W.2d 857, 859 (S.D.1989) (when employee handbook contains a detailed list of exclusive grounds for employee discharge and a specific procedure that the employer agrees to follow prior to discharge, a unilateral contract will be found); *Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 883 (Minn.1986) (language that requires employer to give an employee opportunity to improve performance in the event of nonserious offenses gives rise to unilateral contract); *Pine River,* 333 N.W.2d at 630 (when handbook states "if an employee has violated a company policy, the following procedure will apply," a unilateral contract is formed).

■ Having found that the MPP gives rise to an employment contract terminable only for one of the seven enumerated reasons, we now consider an asserted error of interpretation. BMC and Meyer contend that section XIII B. 7 of the MPP gives BMC the discretion to decide not only who should be terminated in the event of a staff reduction, but whether the termination itself is part of a staff reduction. In effect, appellants argue that their subjective interpretation of the term "staff reduction" should prevail over any interpretation that a court might assign.

It is true that BMC's duty under the contract to provide employment for Hunter is discharged upon the occurrence of a "staff reduction." It is also true that BMC retains the managerial discretion to decide whether a staff reduction should be instituted. However, defining the nature of the event described as a staff reduction as well as deciding whether it in fact occurred are clearly matters to be decided in the court system. Restatement (Second) of Contracts § 226 comments a, b (1981) ("Whether the parties have, by their agreement, made an event a condition is determined by

the process of interpretation."). More specifically, the task of interpreting the contractual terms that give rise to the event claimed to justify the termination Hunter's employment contract. *Young,* 418 N.W.2d at 848. *Farm Bureau Mutual Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 107; *Fashion Fabrics of Iowa v. Retail Inv. Corp.,* 266 N.W.2d 22, 25; E. Farnsworth, Contracts § 7.14, at 298.

The relevant extrinsic evidence came in the form of expert testimony presented by Professor Dolich. He testified as to what parties in the business community typically mean when they use the term "staff reduction". The professor then applied this understanding of the term to the facts as they were presented to him. Professor Dolich concluded that BMC merely retitled, but did not eliminate, Hunter's position and that this was not consistent with what the business community would characterize as a "staff reduction." The jury apparently chose to accept this characterization of prevailing trade custom as well as his application of that custom to the facts of the instant dispute. The jury's verdict on the breach-of-contract claim reflects a conclusion that BMC's duty to perform was not discharged in that a "staff reduction" did not occur. In short, the jury was entitled to find that BMC's stated reason for discharge—a staff reduction—was pretextuous and thus constituted a breach of contract. *See Cannon,* 422 N.W.2d at 642 ("jury could have found that the stated reason for termination of plaintiff's employment was not sincere, and the reasons given were pretextuous"); *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880, 896 (1980) ("The jury is always permitted to determine the employer's true reason for discharging the employee.").

## II. *Future Damages.*

BMC and Meyer next argue that, even if the MPP gives rise to an employment contract, damages for future wages are not an appropriate remedy for breach of that contract. They contend that our breach-of-employment-contract cases do not contemplate an award of future damages given the potential for mitigation by securing subsequent employment.

■ In a breach-of-contract suit, the defendant has the burden of proving that plaintiff could have mitigated her loss through a substitute transaction. *Stauter v. Walnut Grove Prods.*, 188 N.W.2d 305, 312 (Iowa 1971); *DeWaay v. Muhr*, 160 N.W.2d 454, 457 (Iowa 1968); Restatement (Second) of Contracts § 350 comment c (1981). Moreover, the substitute transaction must be employment of a similar nature and caliber. *Barnum v. Nebergall*, 367 N.W.2d 317, 319 (Iowa App.1985); Restatement (Second) of Contracts § 350 comment e, illustration 11 (1981).

■ Since the appellants did not plead any mitigating circumstances, they are limited to circumstances shown or growing out of Hunter's testimony. *DeWaay*, 160 N.W.2d at 457. Hunter testified that his future employment prospects were especially dismal for at least two reasons. First, many employers are apparently reluctant to hire an older individual to fill upper-level managerial positions. Second, most positions comparable to the one held by Hunter at BMC require a Masters Degree. Based on these undisputed facts, BMC and Meyer clearly failed to sustain their burden of showing that Hunter failed to mitigate his loss. We are convinced that Hunter's prospects of securing a position similar to that held at BMC are not favorable and that mitigation is, therefore, unlikely.

The validity of this conclusion is in no way diminished by the fact that after his discharge, Hunter was able to secure a position as executive director of another health care facility, Harold Hughes Centers, Inc. On the contrary, his six-month stint at Harold Hughes indicates that Hunter "did all that was reasonable to find other employment in order to mitigate damages." *Stauter*, 188 N.W.2d at 313. These reasonable but unsuccessful efforts to mitigate his loss do not preclude Hunter from recovering for future wages, as appellants argue. *See* Restatement (Second) of Contracts § 350(2) (1981) ("The injured party is not precluded from recovery ... to the extent that he has made reasonable but unsuccessful efforts to avoid loss."). Instead, reasonable efforts to mitigate contractual losses are to be encouraged by protecting the aggrieved party even when mitigation efforts fail. *See* Restatement (Second) of Contracts § 350 Comment h (1981).

As a final matter, award of future damages is consistent with both the traditional damage award for breach of contract as well as the award contemplated by our employment contract case law. In *Cannon*, a personnel policy manual case, we approved of jury instructions that provided for recovery in the amount plaintiff "would have earned ... had his employment contract not been breached." *Cannon*, 422 N.W.2d at 642–43; *cf. Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 687–88 (Iowa 1990) (allowing future wage award in tort of retaliatory discharge). This approach to recovery is consistent with that adopted by other jurisdictions in personnel manual cases. *See, e.g., Lewis*, 389 N.W.2d at 891 (no error in including damages for loss of future earnings); *Pine River*, 333 N.W.2d at 632 (Damage measure for breach-of-employment contract is amount employee would have received had contract been carried out according to its terms.). We, therefore, find no error in the award of future damages on the breach-of-contract action.

### III. *Tortious Interference with a Contractual Relationship.*

■ BMC and Meyer raise three alleged errors concerning the trial court's judgment against Meyer on the tortious interference with a contractual relationship claim. First, it is suggested that, because Meyer was acting as an agent of BMC, he is "effectively" a party to the contract and, as such, cannot be subject to liability in both contract and tort for the same harm claimed in the alleged breach of contract by BMC. Second, appellants contend that Hunter's failure to show a purpose to injure on the part of Meyer should preclude any recovery for tortious interference with the employment contract. Finally, appellants argue that the sum awarded under the tortious interference claim is duplica-

tive of the damage award given for the breach of Hunter's contract.

It is true that one cannot tortiously interfere with a contract to which one is a party. *Klooster v. North Iowa State Bank,* 404 N.W.2d 564, 570 (Iowa 1987). However, Meyer's status as an employee of BMC does not ipso facto make him a party to any contracts BMC might enter, employment or otherwise. More specifically, we have recognized a cause of action for tortious interference with an employment contract where an employee discharges another employee in violation of the employment contract and the discharge is found to exceed the qualified privilege to which officers and directors are entitled. *Wolfe v. Graether,* 389 N.W.2d 643, 658–60 (Iowa 1986); *see also Bossuyt v. Osage Farmers' Nat'l Bank,* 360 N.W.2d 769, 778–79 (Iowa 1985) (noting that an employee who fraudulently or in bad faith interferes with contract between the employer and a third party is not immune to liability for tortious interference).

The record herein discloses a number of uncontroverted facts on which a jury could have concluded that Meyer exceeded his "qualified privilege." As an initial matter, Meyer and Hunter were originally competitors for the position of Executive Director, which was, of course, ultimately given to Meyer. At Meyer's welcoming tea, Meyer openly snubbed Hunter in front of his coworkers. Within two weeks after assuming his new position, Meyer decided to terminate Hunter, effective immediately. Meyer testified that he made this decision without considering Hunter's job performance evaluations and without considering whether Hunter might be appropriate for the "new" position of Director of Professional and Support Services. Meyer offered Hunter no justification for the elimination of his position. In addition, Hunter, an employee of over thirteen years, was not offered any form of staff reception, tea or other form of acknowledgment of his years of service to BMC. Finally, Cunningham, the individual Meyer chose for the "newly" created position of Director of Professional and Support Services, tendered his notice of termination at his for-

mer job prior to the date Hunter was discharged. These actions, some of which contravene various procedural provisions in the MPP governing staff reductions, are sufficient to support a finding by the trier of fact that Meyer's discharge of Hunter was not insulated from liability by the qualified privilege normally attaching to action by corporate directors and officers.

Although Hunter need not show Meyer acted with malice, *Edward Vantine Studios v. Fraternal Composite Service,* 373 N.W.2d 512, 514 (Iowa App.1985), a showing that Meyer's actions were improper is required. *See* Restatement (Second) of Torts § 767 comment a (1981). Not every discharge made in breach of a contract of employment will subject the manager or director who initiated the discharge to liability in tort. In deciding whether an actor's conduct is improper, the following factors will necessarily be relevant:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Restatement (Second) of Torts § 767 (1981). Especially relevant in the case at hand would be any violation of "recognized ethical codes for [this] particular area of business activity or of established customs or practices regarding disapproved actions or methods...." Restatement (Second) of Torts § 767 comment c. In addition, the jury is entitled to rely on "its common feel for the state of community mores and for the manner in which they would operate upon the facts [herein]." *Id.*

The appellants' final contention apparently arises from the fact that the jury accepted the sum suggested by Hunter's damage expert as an accurate measure of the total damages sustained by Hunter and then ap-

portioned seventy-five percent of that sum to the breach-of-contract claim and twenty-five percent to the tort claim. BMC and Meyer argue that this result mandates a conclusion that the award for tortious interference is duplicative of the contractual award.

As a general matter, both the breaching party and the tortfeasor are joint wrong-doers and each is severally liable for the loss. L. Prosser & W. Keeton, *Torts* § 129, at 1003 (1984) (discussing the tort of interference with a contractual relationship). As a consequence, so long as the sum of the awards under the two causes of action does not exceed the total monetary harm suffered by Hunter, a claim of duplicative damage awards is not tenable. It should be noted, however, that the apportionment of the monetary award between the tortfeasor and the breaching party is a matter that must be committed to the sound discretion of the trier of fact. We see no principled way of distinguishing between the harm attributable to the tortfeasor and that attributable to the party in breach.

IV. *Expert Testimony.*

■ Hunter offered expert testimony by Professor Ira Dolich for the proposition that his discharge was not part of a bona fide staff reduction. In particular, Professor Dolich concluded that Hunter's former position was merely retitled and not eliminated as would be expected with a "staff reduction" as that term is understood by reasonable members of the business community.

BMC and Meyer challenge the admission of this expert opinion evidence on the basis of three asserted foundational deficiencies. They argue that the subject matter did not admit of expert testimony, that the expert was not qualified and, finally, that the factual basis for the opinion was incomplete.

The standard of review for questions of admissibility is quite deferential. Rulings on the admission of expert testimony are for the most part committed to the sound discretion of the trial court. *State v. Halstead,* 362 N.W.2d 504, 506 (Iowa 1985). However, the general rule is one of liberali-

ty in admission. *Id.* "We find an abuse of discretion [only] when such discretion is exercised on grounds or for such reasons clearly untenable or to an extent clearly unreasonable." *Hubby v. State,* 331 N.W.2d 690, 697 (Iowa 1983). As long as there is some support in the record for the trial court's action, we will not reverse. *State v. Frank,* 298 N.W.2d 324, 327 (Iowa 1980).

Iowa Rule of Evidence 702 provides the proper starting point in deciding whether a particular subject is amenable to expert testimony. Rule 702's sole limit vis-à-vis subject matter is that the "scientific, technical or other specialized knowledge will *assist* the trier of fact to understand the evidence or to determine a fact in issue." Iowa R.Evid. 702 (1991) (emphasis added). Necessity is clearly not required. Instead, admission hinges on "a commonsense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *M–Z Enter., Inc. v. Hawkeye–Sec. Ins. Co.,* 318 N.W.2d 408, 414 (Iowa 1982) (citing Ladd, *Expert Testimony,* 5 Vand.L.Rev. 414, 418 (1952)).

The intricacies of corporate organization and hierarchy are sufficiently removed from the experience and knowledge possessed by an "untrained layperson" that expert testimony would surely assist the trier of fact in sifting through the data relating to BMC's purported reorganization. We believe it is reasonable to assume that expert testimony will assist an untrained layperson in reaching an intelligent resolution of this matter. Consequently, we conclude that the subject matter dealt with herein is not an impediment to the admission of Professor Dolich's testimony.

■ Appellants' second asserted foundational error questions whether Professor Dolich was sufficiently qualified to render an opinion on the subject of managerial structure. BMC and Meyer contend that, because Professor Dolich's expertise lies in the area of marketing management, he was

not qualified to speak to the issue of corporate structure in general.

Iowa Rule of Evidence 702 requires the witness to be "qualified as an expert by knowledge, skill, experience, training or education." *Id.* However, the witness need not be a specialist in the particular area of testimony so long as the testimony falls within the witness' general area of expertise. *State v. Peterson,* 219 N.W.2d 665, 673 (Iowa 1974) ("[A] doctor is not incompetent to testify as an expert merely because he is not a specialist in a branch of his profession."). Moreover, Professor Dolich indicated that the principles of management are essentially the same throughout the field of business administration regardless of one's area of subspecialization. The nice distinctions that appellants have made between the various subspecialities of business administration are more properly directed to the weight of the evidence offered as opposed to its admissibility. *Peterson,* 219 N.W.2d at 673.

■ Appellants' final complaint is that Professor Dolich based his opinion on an incomplete assessment of the factual record. In formulating his opinion, Professor Dolich considered organizational charts, job descriptions and a written analysis of the reorganization process at BMC prepared by one of BMC's employees. BMC and Meyer insist that Professor Dolich studied only a portion of the written analysis—that portion detailing the reorganization process from its inception until one month after Hunter's discharge—and that this failure to study the entire report should render inadmissible his entire testimony.

Iowa Rule of Evidence 703 is the pertinent authority, and it reads as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the trial or hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. ·

Notably, there is no further requirement that the facts or data relied upon be of a certain scope or breadth. Any asserted deficiencies in scope or breadth are considerations that go to the weight of the testimony, not its admissibility. The cases cited by BMC and Meyer for the proposition that there is some additional breadth or scope requirement are not on point. *See, e.g., Hardwick v. Bublitz,* 254 Iowa 1253, 1258–59, 119 N.W.2d 886, 890 (1963) (expert was not shown to be qualified); *Hedges v. Conder,* 166 N.W.2d 844, 857 (Iowa 1969) (failure to show expert's qualification and any factual basis for opinion on car's speed).

Having found the trial court's decision to be sound in all respects considered herein, it is affirmed.

AFFIRMED.