_____

No. 95-1569
_____

Tilak Raj Sawheny, also known    *
as Roger Sawheny,    *
   *
      Appellant,    *
   *  Appeal from the United States
   v.    *  District Court for the
   *  Southern District of Iowa.
Pioneer Hi-Bred International,    *
Inc., an Iowa Corporation,    *
   *
      Appellee.    *

_____

Submitted: March 11, 1996

Filed: August 27, 1996
_____

Before McMILLIAN, BEAM, and HANSEN, Circuit Judges.
_____

BEAM, Circuit Judge.

In this diversity action for damages, Roger Sawheny appeals the district court's[1] orders: (1) granting summary judgment to Pioneer Hi-Bred International, Inc. (Pioneer) on Sawheny's RICO claim; (2) entering judgment for Pioneer after a bench trial on Sawheny's litany of tort and breach of contract claims; and (3) denying Sawheny's post-judgment motion to make additional findings of fact. We affirm.

---

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

## I.    BACKGROUND

Pioneer is an Iowa corporation engaged in the seed business.  In 1978, Pioneer, through its wholly-owned subsidiary Pioneer Oversees Corporation (POC),[2] formed Pioneer Seed Company Limited (PSCL) as a corporation licensed under the laws of India.  To comply with Indian law, Pioneer retained ownership of only forty percent of the PSCL stock.  Indian nationals owned the remaining sixty percent of the stock:  Sanjogta Kapoor owned just under forty percent and her brother, Surinder Sehgal, owned twenty percent of the PSCL shares.  Pioneer provided most of the funding for PSCL.  Sehgal served as President of POC until 1988.

After the formation of PSCL, numerous agreements were executed between POC, Pioneer, and PSCL.  These contracts included research agreements, a registered user agreement, a collaboration agreement, and a loan agreement.  The Indian government approved each of these agreements when necessary.  Under these agreements, Pioneer retained its proprietary rights in all seeds and their progeny, other genetic materials, research data, and research results.

In July 1983, Sawheny, a Canadian citizen, was hired by POC at Sehgal's behest.  At the time, Sawheny was unemployed but married to Sehgal's niece.  After an orientation period, Sawheny's primary duty was to investigate the condition of PSCL and report back to Sehgal, the President of POC.  At meetings held in December 1983, Sawheny reported that PSCL was being mismanaged.  In 1984, pursuant to the collaboration agreement with PSCL and with the approval of the Indian government, Pioneer sent Sawheny to India, where he soon became the General Manager of PSCL. Pioneer "deputed" or loaned Sawheny from its POC subsidiary to PSCL. Sawheny received a salary from POC of $30,000, which was deposited in a bank in Iowa.  In

---

[2]Because POC is a wholly-owned subsidiary of Pioneer, we sometimes refer to POC as "Pioneer."

addition, he received a separate salary in Indian currency (5,000 rupees per month), tax-free, and other benefits, from PSCL.

When Pioneer first hired Sawheny, he completed and signed a form stating that he was a Canadian citizen working outside of the United States. This form was filed with the appropriate income tax authorities. In a letter signed by Sehgal and dated July 5, 1983, Pioneer acknowledged that Sawheny was a POC employee beginning on July 1, 1983, and that his base salary was $30,000. The letter does not state that Sawheny's salary was to be tax free; nor does it state that Sawheny had no obligation to pay income tax.

In contrast, PSCL had agreed that Sawheny's salary would be tax-free. The Indian government, however, denied PSCL's application to have Sawheny's PSCL income declared exempt from Indian income taxes. As a result, PSCL paid the income taxes on Sawheny's PSCL salary as it had agreed to do. This tax obligation imposed upon Sawheny's PSCL income made him anxious about paying Indian income tax on his salary from POC. Consequently, Sawheny asked for a letter from POC designed to provide him with a colorable defense if Indian tax authorities attempted to tax his POC salary. In response to Sawheny's request, Sehgal asked POC counsel Ross Porter to prepare a letter. Porter drafted a letter for Sehgal, dated June 19, 1987, stating that POC would continue to compensate Sawheny for his work done outside of India while PSCL would continue to pay him a salary for his work done in India. This letter, however, also expressly stated that "every employee of Pioneer and its subsidiaries is expected to pay his or her own personal taxes." Joint App. at 5121.

In 1985, Sawheny was named President of PSCL, which was a change in title only because his duties remained the same as when he was General Manager. While working for both POC and PSCL from 1984 to late 1987, Sawheny did most of his work in India. In

December 1987, Pioneer promoted Sawheny to the position of Regional Operations Director of POC's Asia/Pacific Region.

During this time, Pioneer had been working with its Indian lawyers and accountants to increase its share of PSCL stock to seventy percent, in accordance with a change in Indian law. Although neither Sehgal nor Sawheny objected to the proposed transfer of PSCL stock, Sehgal resisted efforts to reorganize Pioneer's overseas operations. Dissatisfied when the reorganization took place, Sehgal decided to leave Pioneer. He sought out persons who could supply him with venture capital in order to start a new company that would compete directly with Pioneer. In the fall of 1987, Sehgal held secret meetings which were attended by key POC employees (Hari Shukla and Ken Mishra), an employee of a Pioneer competitor (Dave Nanda), and Sawheny. At Sehgal's direction, Mishra prepared a plant breeding plan in which hybrids and inbreds owned by Pioneer, along with similar materials from other institutions and firms, would be used as genetic stock in a manner that would disguise their pilfered parentage.

In late February 1988, Mishra informed Pioneer's President and CEO, Thomas Urban, that Sehgal intended to start a new seed company to compete with Pioneer. Urban initially did not believe that his trusted employee Sehgal would do such a thing. Urban asked Mishra to gather proof of Sehgal's planned defection. On February 28, 1988, Mishra made a tape recording of a conversation with Sehgal that substantiated Mishra's allegation that Sehgal was planning to start a new company which would use Pioneer's technology. The tape was played to Pioneer executives. They were shocked by the plan. The next day, Sehgal met with venture capitalists in Boston who pledged $5 million for the new company.

On March 8, 1988, Urban confronted Sehgal. When Sehgal refused to confirm or refute the Mishra allegations, Urban

terminated Sehgal.[3]  On the same day, Urban called Sawheny, who was traveling on business in Thailand, and told him about Sehgal's termination. At that time, neither Urban nor the other executives at Pioneer knew that Sawheny participated in the secret meetings.  They knew, however, that Sawheny was married to Sehgal's niece and thus Urban told Sawheny not to have contact with Sehgal.  Concerned that its genetic material was at risk, Pioneer sent POC's Mishra to India to do whatever he could to protect the germplasm.  Mishra and other Pioneer executives became concerned when Sawheny demonstrated reluctance to assist in complying with Pioneer's order to secure its property.

In March 1988, Urban contacted Sawheny and requested that he travel to Des Moines, Iowa, to discuss the establishment of POC's regional office in the Philippines.  Urban, who became the President of POC upon Sehgal's termination, wanted to meet with Sawheny to be sure that Sawheny was the right person to serve as the Regional Director for the Asia/Pacific Region. Urban decided that Sawheny could not serve as both the Regional Director for POC in the Philippines and at the same time perform his full-time job as President of PSCL in India.  Accordingly, Urban asked Sawheny to resign from PSCL.  Sawheny agreed and signed a letter of resignation.  Urban also recognized that Sawheny could face personal conflicts managing a company competing with his wife's uncle, Sehgal, and thus Urban decided to remove India from the countries within Pioneer's Asia/Pacific region.  Sawheny agreed that he would go to India for three weeks to put his personal affairs in order and then he and his family would move to the Philippines where he would work as POC's Regional Director for the Asia/Pacific Region. Once again, Urban told Sawheny not to have any contact with Sehgal.  Sehgal had, on March 19, already contacted Sawheny at Sawheny's hotel in Des Moines.  Despite

---

[3]Pioneer filed a lawsuit against Sehgal, which, along with a counterclaim, was eventually settled in the fall of 1989.

Urban's admonitions, Sawheny continued to speak with Sehgal about how Sehgal planned to handle PSCL.

Sawheny's resignation as PSCL President was approved at a PSCL board meeting on March 31, 1988.  In the meantime, Sehgal was orchestrating the handling of PSCL affairs through his sister, Kapoor.  She scheduled a second meeting of the board to be chaired by Sehgal.  While in India at Urban's request, Mishra learned that Sawheny planned to attend this rival board meeting.  Upon learning of this from Mishra, Urban told Mishra to have Sawheny call him.  Sawheny did not contact Urban.  On April 14, Sawheny went to the PSCL offices to attend the board meeting, where he was confronted by Mishra and employees loyal to Pioneer.  When asked whether he was joining Sehgal or remaining loyal to Pioneer, Sawheny refused to answer, thereby implying that he had decided to switch loyalties and work with Sehgal.  Pioneer's legal counsel in India obtained an ex parte injunction barring the April 14 PSCL board meeting.  The injunction was served on Sehgal moments before the meeting, which then did not take place.  After Urban had heard what transpired, he concluded that Sawheny was no longer loyal to Pioneer, but instead was working with Sehgal to free PSCL from Pioneer's control.  On April 15, a termination letter was drafted and sent to Sawheny, who claims not to have received it.  Without a POC job, Sawheny's deputation ended and he lost his authority to remain in India.

On April 22, Sehgal held a PSCL board meeting at which a newly constituted board (including two additional relatives of Sehgal) refused to accept Sawheny's previously tendered resignation from PSCL.  Sawheny immediately went back to work as President of PSCL.  The next day, Sawheny sent a letter to Pioneer in which he informed Urban that he refused to go to the Philippines for POC and intended to resume his position with PSCL. In that letter, Sawheny also alleged that he had been coerced into signing his previous letter of resignation from PSCL.  Although the letter was unnecessary given that Sawheny had already been terminated from POC, Urban

nevertheless construed it to be a letter of resignation from POC.

Sawheny claims he did not know of his termination from POC until the fall of 1988. He did not, however, report to the Philippines or prepare any reports for POC after April 22. Notice of Sawheny's termination from POC was published in the Pioneer _Insider_ publication (a corporate communication for Pioneer's employees), along with a warning that Pioneer employees should not travel to India.

At the April 22, 1988, board meeting, Sehgal took control of PSCL. In response, Pioneer established another company, PHI Biogene (Biogene), to carry out its Indian operations. Several Indian agencies, including the Ministry of Agriculture, granted Biogene permission to establish operations in India. In June 1988, H.R. Bhardwaj, the Research Director for Biogene, sent a letter on POC letterhead to the Indian Secretary of Agriculture to explain various disputes and litigation involving Biogene and PSCL.[4] In this letter, Bhardwaj reported that Sehgal and Sawheny were dishonest and were attempting to make false allegations against Biogene. During this time, Sawheny and PSCL were also sending various materials to the Indian government hoping to persuade it to reject Biogene's application to do business in India.

In June 1988, Porter, POC's counsel, was informed that the Indian government had requested a letter regarding Sawheny's POC income for the years 1983 through 1988. Porter prepared the letter, which stated:

> To Whom It May Concern: This is to confirm that Mr. T.R. Sawheny, whose services were delegated by us to PSCL New Delhi, received remuneration from us in the U.S.A. for the services rendered by him in India. The gross

---

[4]During 1988, approximately 20 lawsuits were filed in India by and against Pioneer, PSCL, and their agents.

> remuneration paid to him in the U.S.A. during April 1984
> through March 1988 was U.S. $175,543.80. After deductions of
> U.S. $2,283.50 his net remuneration of U.S. $173,260.30 was
> deposited by us in his bank accounts in the U.S.A.

The record does not indicate whether this letter was ever sent to or received by the Indian government. Jerry Chicoine, Assistant Secretary of POC, prepared a similar letter, the contents of which were quoted in the tax assessment levied against Sawheny by the Indian government.

In the summer of 1988, PSCL applied to the Indian government for an extension of Sawheny's visa, which was due to expire on October 3, 1988. Because Sawheny was no longer a POC employee, the standard letter consenting to his continued deputation was not included in the application. The Indian government refused the visa extension request. In December 1988, the Indian Foreign Exchange Regulation Department and Indian income tax authorities summoned Sawheny to appear on December 16, 1988. Sawheny asserts that he was advised by his Indian accountant to leave the country immediately. Prior to leaving, Sawheny sent Indian authorities a medical certification stating that due to a heart condition he would not be able to participate in the hearing. Upon arriving in the United States, Sawheny visited a medical doctor who wrote a letter that Sawheny was in poor health and unable to travel. This letter was sent to the Indian government. Despite these representations, Sawheny immediately traveled to Canada to interview for a new job with a prior employer. Sawheny refused that position but accepted a position with a company in Iowa, where he worked until 1993.

After leaving India, PSCL continued to furnish Sawheny with an accountant to help him with his Indian tax problems. Sawheny, however, never returned to India to defend against the Indian tax charges, nor did he provide the documentary evidence requested by

the Indian government.  In February 1991, his accountant falsely told Indian authorities that Sawheny's whereabouts were unknown.  The Indian tax authorities found Sawheny in default and ordered him to pay back taxes plus interest and penalties.  Sawheny has refused to pay those sums.

In April 1990, Sawheny filed this action in federal district court alleging that Pioneer tortiously interfered with his employment contract and defamed him.  Sawheny then filed an amended complaint in which he added an additional RICO claim.  See 18 U.S.C. §§ 1961, 1962.  On February 19, 1993, the district court granted Pioneer's motion for partial summary judgment and dismissed the RICO claim.  Sawheny then filed another amended complaint, in which he asserted claims for common law fraud, breach of employment contract, wrongful discharge, and defamation, as well as preserving his right to appeal the dismissal of his RICO claim.

A bench trial was held in August 1993.  The district court entered judgment for Pioneer on all claims.  Subsequently, the district court denied Sawheny's post-trial motion to make additional findings of fact. Sawheny now appeals from these district court orders.

On appeal, Sawheny makes four arguments.  First, he claims that the district court ignored the criteria established by the Iowa Supreme Court for determining whether actions are "intentional" or "improper" in a case of interference with an employment relationship.  Second, Sawheny argues that the district court erred in concluding that Pioneer had a qualified privilege to libel him.  Third, Sawheny asserts that the district court should have made the additional findings requested in his Rule 52(b) motion.  Finally, Sawheny contends that the district court erred in dismissing his RICO claim on summary judgment because he did allege acts giving him standing to bring his claim under RICO.

## II.  DISCUSSION

Sawheny's first two arguments require us to review the district court's order entering judgment for Pioneer.  While we review a district court's conclusions of law de novo, we review the district court's findings of fact under the clearly erroneous standard.  See Fed. R. Civ. P. 52(a). Under clear error review, we will not overturn a finding of fact unless: (1) such finding is not supported by substantial evidence; (2) such finding is based upon an erroneous view of the law; or (3) we are left with the definite and firm conviction that an error has been made.  See, e.g., Stevens v. McHan, 3 F.3d 1204, 1206 (8th Cir. 1993).

### A.    Tortious Interference with Employment Contract Claim

Sawheny first contends that Pioneer intentionally interfered with his contractual relationship with PSCL after he decided to remain President of PSCL and not to work for POC.[5]  Sawheny claims that he would still be President of PSCL today if he had not been forced to leave India due to the tax problems caused by Pioneer's submission of information to Indian tax authorities on Sawheny's POC income.

Under the applicable law of Iowa, based on the Restatement (Second) of Torts §§ 766, 766A, & 766B (1979) (hereafter cited as "Restatement"), "`[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person'" is liable for resulting damages.  See Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa, Inc.,

---

[5]We note that the district court concluded that Pioneer had not improperly interfered with Sawheny's relationship with PSCL when he agreed to resign and work full time as POC's Regional Director.  Sawheny has not challenged this ruling on appeal.

473 N.W.2d 31, 35 (Iowa 1991) (quoting Restatement § 766).[6]  Therefore, Sawheny had the burden of proving, by a preponderance of the evidence, the following elements:  (1) an existing valid contractual relationship or business expectancy with PSCL; (2) knowledge of this by Pioneer; (3) intentional interference inducing or causing a breach or termination of the contract; and (4) resulting damages.  Westway Trading Corp. v. River Terminal Corp., 314 N.W.2d 398, 402-03 (Iowa 1982).  Although Sawheny need not prove Pioneer acted with malice, he must demonstrate that Pioneer's actions were improper.  Hunter v. Board of Trustees of Broadlawns Medical Ctr., 481 N.W.2d 510, 518 (Iowa 1992).  In determining whether Pioneer's actions constituted improper interference under Iowa law, we consider the following factors:

> (a)  the nature of the actor's conduct,
> (b)  the actor's motive,
> (c)  the interests of the other with which the actor's conduct interferes,
> (d)  the interests sought to be advanced by the actor,
> (e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f)  the proximity or remoteness of the actor's conduct to the interference and
> (g)  the relations between the parties.

Id. (quoting Restatement § 767).  Applying these factors, we conclude that Sawheny failed to prove that Pioneer's conduct was improper.

In attempting to prove that Pioneer improperly interfered with Sawheny's business relationship with PSCL by submitting information about his POC income to Indian tax authorities, Sawheny primarily

---

[6]We note that the Restatement contains several different sections on the tort of intentional interference with contract. Regardless of which section Sawheny relies upon, he must prove that Pioneer acted improperly.  See Restatement § 767 cmt. a.  On these facts, he has failed to make such a showing.

-11-

relies on two pieces of evidence. First, Sawheny argues that a statement made by Pioneer executives at a meeting held in London in late April of 1988 provides proof of the impropriety of Pioneer supplying Indian tax authorities with information about Sawheny's income. Specifically, one of the Pioneer executives stated that Sawheny's tax situation might be used to "level the playing field." When this statement is considered in the context of what was occurring at that time, however, it fails to provide any proof of impropriety on the part of Pioneer. Sawheny had just defected from POC and sided with Sehgal in the battle for control of PSCL. Pioneer had recently formed a new company to compete with PSCL and was attempting to obtain authorization from the Indian government. Furthermore, Pioneer's notification to Indian tax authorities that Sawheny received income from POC for work done while in India was apparently necessary to comply with Indian tax laws.[7] In a memorandum prepared by a tax lawyer specializing in Indian tax law, the lawyer advised POC that Sawheny would not be liable for Indian income tax on salary received from POC "so long as the services are rendered by him wholly outside India and the salary is paid outside India." Joint App. at 5206. The memorandum also warned that "POC could be exposed to violation of Indian income tax laws and other laws on the ground that it aided and abetted such violations by the employee." Id. at 5207. The evidence shows that Sawheny spent the vast majority of his time working in India. Moreover, the record indicates that Pioneer submitted information about Sawheny's POC income in response to a request by Indian tax authorities. Thus, Pioneer had both the right and duty to provide the government of India with accurate tax information concerning Sawheny's POC income and potential tax liability.

---

[7]The fact that PSCL and Biogene, Pioneer's newly-established Indian company, were competitors does not alone prove improper interference. See Restatement § 768(2).

Second, Sawheny asserts that Pioneer acted improperly when it told Indian tax authorities that Sawheny had received a salary from POC for doing PSCL work in India, thereby causing Sawheny to incur a tax obligation in India, while at the same time deducting the full amount of Sawheny's POC salary on POC's U.S. tax returns. To support this assertion, Sawheny points to the Indian tax assessment in which it quotes a letter from POC Assistant Secretary Chicoine. In this letter, Chicoine states that during the period from February 1984 to March 1988, "besides renumeration [sic] derived by [Sawheny] from Pioneer Seed Company Limited, New Delhi, India, he was drawing renumeration [sic] from the Company for the services rendered by him to Pioneer Seed Company Limited, New Delhi, India." Joint App. at 5228-29. Sawheny correctly points out that a deduction for salary payments under 26 U.S.C. § 162 must be reasonable and necessary for that particular company. Thus, he alleges POC should not have deducted the full amount of Sawheny's salary if part of his POC salary was in fact paid for PSCL work.

While Sawheny's argument may correctly articulate the general rule under U.S. income tax law, it fails to demonstrate that Pioneer acted improperly when it provided Indian tax authorities with information on Sawheny's POC salary. Chicoine testified that Pioneer was authorized to deduct Sawheny's POC salary under two provisions of the U.S. Internal Revenue Code (Code): (1) as an ordinary and necessary business expense under 26 U.S.C. § 162; and (2) as an expense reasonably incurred in the oversight of a company's investments under 26 U.S.C. § 212. The record indicates that POC owned forty percent of PSCL and had numerous operating agreements with it. Moreover, the Chicoine letter quoted in the Indian tax assessment does not state that Sawheny was paid by Pioneer for work done solely for PSCL. Given the circumstances of Sawheny's dual employment and the relationship between the companies, Sawheny has failed to establish that Pioneer's tax treatment of his POC income did not comply with U.S. income tax laws. In any event, we are not called upon in this case to

scrutinize Pioneer's tax returns.  Therefore, Sawheny failed to establish that Pioneer improperly interfered with his employment relationship with PSCL.

Sawheny also seems to suggest that Pioneer acted improperly in reporting to Indian tax authorities that Sawheny had done work for POC while in India because POC knew that Sawheny would be liable for Indian taxes on income earned in India.  The record indicates that Sawheny spent the vast majority of his time in India while working in his dual capacity for PSCL and POC.  Regardless of which company Sawheny was working for, he was obligated to pay Indian income tax for work done while in India.  Sawheny knew that he was responsible, directly or indirectly, for the payment of all income taxes.  Once the Indian tax authorities investigated Sawheny, he fled the country and has not opposed the tax assessment or provided the documentary evidence requested.

Even if Sawheny demonstrated that Pioneer improperly interfered with a contractual relationship with PSCL, he nevertheless failed to prove that such interference caused him to lose his job with PSCL.  Causation is both a factor to consider in analyzing whether Pioneer's actions were improper, see Restatement § 767(f), and one of the elements of Sawheny's tortious interference with employment contract claim, see Westway Trading Corp., 314 N.W.2d at 402-03.  In fact, the record indicates that Sawheny's visa had already expired on October 3, 1988, approximately two months before he left India.  Moreover, Sawheny may have left India for health reasons.  Although Pioneer provided the tax information to the Indian authorities, the record indicates that the investigation into Sawheny's tax liability in India began before any documents were submitted by Pioneer.  Sawheny has not demonstrated that the assessment of those taxes in India was incorrect; nor has he challenged the imposition of those taxes in India.  Therefore, Sawheny failed to prove that any improper interference by Pioneer caused him to abandon his contract with

PSCL.[8]  Accordingly, we conclude that Sawheny failed to prove that Pioneer improperly interfered with his employment relationship with PSCL and failed to demonstrate that any action by Pioneer caused him to lose his job with PSCL.

###     B.     Defamation Claim

Sawheny next contends that several Pioneer employees wrote defamatory letters and sent them to Indian officials or other individuals in the agricultural seed business.  On appeal, Sawheny focuses on a letter, dated June 1, 1988, written by Bhardwaj on POC letterhead, stating that Sawheny had been dismissed by Pioneer because Sawheny was dishonest and disloyal.[9] Sawheny asserts that this letter was mailed to the Indian Secretary of Agriculture.  Moreover, according to Sawheny, Mishra, also an employee of Pioneer at the time, sent copies of Bhardwaj's letter to several individuals associated with the seed business in India and England.  The district court concluded that although the statements in the Bhardwaj letter were actionable per se because they attacked Sawheny's integrity, Pioneer satisfied its burden of proving that it had a qualified privilege to make these statements and they were substantially true.  We agree.

---

[8]Sawheny's reliance on Sehgal's testimony that Sawheny would still be President of PSCL if it were not for his tax problems in India misses the mark because Sawheny failed to demonstrate that he would have no tax problems in India if it were not for the alleged improper actions of Pioneer or that his visa problem would have been resolved.

[9]Sawheny has apparently abandoned his argument that Pioneer libeled him by publishing that he had been terminated for cause in the Pioneer publication, Insider.  He also has seemingly abandoned his contention that Pioneer libeled him when Porter and Chicoine sent letters to Indian tax authorities in which they stated that Sawheny's POC salary was for work performed in India.  To the extent he has not abandoned these arguments, we nevertheless find them to be without merit.

Under Iowa law, libel is the "`malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business.'" Vinson v. Linn-Mar Community Sch. Dist., 360 N.W.2d 108, 115 (Iowa 1984) (quoting Plendl v. Beuttler, 111 N.W.2d 669, 670-71 (Iowa 1961)). Attacking the integrity and moral character of a party constitutes libel per se. Id. at 116. Iowa law provides for an affirmative defense of qualified privilege, which applies when the statements are made on an appropriate occasion in good faith on a subject in which both the party making the allegedly libelous statement and the party receiving that statement have a shared interest, right, or duty. Id. We agree with the district court that the Bhardwaj letter, as well as other letters by Porter and Chicoine to Indian tax authorities, were matters of legitimate concern for Pioneer's business interests and of legitimate concern to the Indian government. Therefore, Pioneer adequately established a defense of qualified privilege.

The affirmative defense of qualified privilege only protects statements made without actual malice, which is separate and distinct from the type of malice that is implied in a libel per se case. See id. at 116-17 (stating that libel per se presumes "implied malice" or "malice in law" but to defeat a qualified privilege defense the plaintiff must nevertheless prove actual malice, which requires proof that the statement was made with ill-will or wrongful motive). Although the Bhardwaj letter does state that Sawheny was dishonest and disloyal--assertions which Sawheny asserts were disputed during trial--when the letter is read in its entirety, the reader is left with the impression that the letter was written as part of the ongoing battle between Sehgal's faction, which included Sawheny, and Pioneer over obtaining a larger market-share in India. Thus, we agree with the district court that

Sawheny failed to prove that the persons who wrote and published the letters did so with actual malice.[10]

In fact, the record indicates that Bhardwaj's statement was his characterization of what had transpired and was nevertheless substantially true. The Supreme Court of Iowa has held "that if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation." <u>Hovey v. Iowa State Daily Publication Bd., Inc.</u>, 372 N.W.2d 253, 256 (Iowa 1985). In a letter dated April 15, 1988, Urban notified Sawheny that his employment with Pioneer and any of its subsidiaries was terminated for several reasons including:

> your insubordination in failing to comply with direct orders communicated to you to immediately contact [me], attendance and participation in a meeting called and directed by Surinder Sehgal at the offices of [PSCL] without having obtained requisite consent to attend and instructions from your supervisor, interference with the affairs of [PSCL], and insubordination in contacting and communicating with Dr. Sehgal in direct violation of instructions of your supervisor.

Joint App. at 4905. Bhardwaj's deposition in Sehgal's case, which was received into evidence in the present case, demonstrates that Bhardwaj thought Sawheny had acted dishonestly and disloyally when he asked for time off to visit India before beginning his new full-time job with POC and went to the PSCL board meeting called by Sehgal. Joint App. at 1328-29. The record supports Pioneer's

---

[10]Sawheny's counsel asserted at oral argument that all of Sawheny's claims are built upon the premise that Pioneer acted improperly when it deducted all of the salary paid by POC to Sawheny as a necessary and reasonable business expense under U.S. income tax laws while at the same time informing the Indian tax authorities that Sawheny was paid by POC for PSCL work in India. As discussed above, he has failed to establish that Pioneer acted improperly. Therefore, just as Sawheny failed to prove that Pioneer acted improperly under his tortious interference with employment contract claim, he also failed to prove that Pioneer's conduct constituted actual malice in his defamation claim.

position that Sawheny remained in constant contact with Sehgal, in direct violation of his commitment to Urban. Because the information provided to the Indian Secretary of Agriculture was substantially true, it provides Pioneer with an absolute defense against Sawheny's libel claim. <u>Hovey</u>, 372 N.W.2d at 256.

### C. Sawheny's Other Claims

Sawheny also challenges the district court's order denying his motion to modify its findings of fact, make additional findings of fact, and amend its final judgment accordingly. <u>See</u> Fed. R. Civ. P. 52(b). We agree with the district court that Sawheny's Rule 52(b) motion was meritless. Lastly, we have also reviewed Sawheny's RICO argument and find it to be without merit.

### III. CONCLUSION

Sawheny essentially urges us to ignore or reject the district court's findings of fact. Sawheny has failed, however, to meet his substantial burden in demonstrating that the district court's findings were clearly erroneous. Accordingly we affirm the district court's orders and overrule any pending motions.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-18-