**David E. SYKES, Plaintiff,**

v.

**Charles HENGEL, Michael Iiams, David Muris, Lee Schlessman, and Fred Wiesner, Defendants.**

**No. 4:03 CV 40526.**

United States District Court, S.D. Iowa, Central Division.

June 23, 2005.

---

F.3d at 1106 n. 6. It therefore follows that the Ninth Circuit abrogated *Lathigra sub silentio*

in *Balcorta.*

Mark D. Sherinian, Sherinian & Walker Law Firm, West Des Moines, IA, for Plaintiff.

Wade R. Hauser, III, Ahlers & Cooney PC, Des Moines, IA, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter comes before the Court on Defendants' Motions for Summary Judgment. Oral arguments were heard on May 12, 2005. Plaintiff was represented by Mark Sherinian; Defendants were represented by Nate Overberg and Wade Hauser. The matter is fully submitted and ready for disposition.

### I. JURISDICTION

Plaintiff filed this action on September 22, 2003, alleging diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff Sykes is a resident of Fairfield, Iowa. Defendants Iiams, Schlessman, and Wiesner are residents of Colorado; Defendant Muris is a resident of California, and Defendant Hengel is a resident of Minnesota. Plaintiff alleges the amount in controversy is in excess of $75,000.

### II. FACTUAL AND PROCEDURAL HISTORY

In August 2001, David Sykes signed a five-year employment contract as President and Chief Executive Officer for Vision Improvement Technologies, LLC ("VIT"), an Iowa corporation located in Fairfield, Iowa. The contract provided that aside from disabling illness, injury, or death, Sykes could only be terminated for cause. Cause, as defined in Section 7(a)(i) of Sykes' employment contract, included "[c]ommission by the Employee of any fraudulent or grossly negligent act which, in the good faith opinion of the Employer, would then impair the Employee's ability to perform his duties."

VIT's Operating Agreement placed control of the company in a six-person Board of Managers (the "Board").[1] Until July 2003, the Board consisted of Defendants Charles Hengel, Michael Iiams, Davis Muris, and Fred Wiesner, as well as Cliff Rose[2] and Plaintiff David Sykes. Under the terms of his contract, Sykes' duties and responsibilities as VIT's President and CEO were determined by the Board of Managers.

At all times relevant to this action, Defendants Lee Schlessman and Fred Wiesner were partners of Ithaka V, an investment partnership that provided lines of credit to investment companies, and Defendant Charles Hengel was Chief Execu-

---

1. The applicable VIT Operating Agreement stated in pertinent part, [T]he Board of Managers shall have and may exercise, on behalf of the Limited Liability Company, all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Limited Liability Company, except as set forth in Section 6.03.

 The powers of the Board of managers shall include, without limitation, the power to:

 . . . . .

 (b) employ and dismiss from employment any and all employees, agents, and indepen-

dent contractors, and delegate to them such responsibilities as the Managers shall determine; . . .

2. In addition to the present action, two other lawsuits based on the same events are pending in Iowa state court. VIT is named in one of those suits; Cliff Rose is named in the other.

tive Officer of Marketing Architects, a radio advertising firm. VIT contracted the services of both Ithaka V and Marketing Architects. Wiesner and Hengel were also members of VIT's Board, and Schlessman became a Board member on July 1, 2003. It is undisputed that the Board had full disclosure regarding these relationships.

The Ithaka V provided VIT with a line of credit ("the LOC") which was based on VIT's cash and accounts receivable. In March 2002, Sykes was advised that the LOC was set to expire on December 15, 2002, and that a new lending source must be secured. Unaudited financial statements as of June 2002 showed that VIT had a net income of $281,000 and a projected net income of $495,000. In September 2002, those profit projections were questioned by potential lenders. As a result, Sykes was unsuccessful in securing a new line of credit. In the fall of 2002, without new financing secured, Sykes asked Ithaka V to extend and increase the LOC. Ithaka V extended the note to December 15, 2003, but the LOC remained at $2–million dollars.

Unaudited year-end reports showed a profit of $104,683 for 2002. Based on the reported year-end profit, bonuses were awarded in February 2003. Sykes and Rose were among those that received bonuses. It is undisputed that these bonuses were never formally reported to the Board.

On March 7, 2003, the Board set up an Executive Committee to explore ways of improving VIT's operational performance. Hengel was elected Chairman of the Board of Managers, and an Executive Committee consisting of Hengel, Iiams, and Sykes was created. In April, the Executive Committee found that the monthly operating cost of over $250,000 was more than double what it should be and that staff could be reduced by more than one-half.

In March 2003, auditors began to review VIT's financial statements for the first time. By April 2003, the Board became aware that the year-end profit reports were flawed and that VIT was in financial trouble. The audit showed that the reserve rate for product returns and bad debt had been artificially reduced in the fall of 2002. Rather than having a profit of $104,683, VIT actually lost more than $859,000 for 2002. Board members began discussing remedies. Sykes' performance as president was called into question.

VIT's financial problems continued through the spring of 2003. On June 4, 2003, Sykes sent a letter to Ithaka V, describing VIT's financial condition and asking for adjustments to the LOC. Sykes explained that VIT was making progress but that cash was tight and VIT was unable to buy the media time necessary to generate sales. He went on to explain that this caused a reduction in the accounts receivable and asked Ithaka V to consider these factors and extend, rather than call, the LOC.

Concerned about the financial condition of VIT, Iiams called a board meeting for June 23, 2003, to discuss Sykes' ability to manage the company. On June 17, 2003, after being informed the Board intended to meet with him, Sykes sent a second letter to Ithaka V. Sykes informed Ithaka V that VIT would not have sufficient funds to cover the LOC repayment. He also indicated that Marketing Architects was not able to provide much needed radio advertising which would of course impact the accounts receivable. Nonetheless, Sykes encouraged Ithaka V to band together with the management team, the Board of Managers, and Marketing Architects to support the needs of VIT during its financial dilemma. Sykes again asked Ithaka V to reconsider increasing the LOC and to make its decision before the Board's visit on June 23, 2003.

On June 20, 2003, three days before the Board's scheduled visit, without consulting or informing the rest of the Board, Sykes sent out a notice ("Notice") to all VIT Unit Holders setting a special meeting for July 8, 2003. The Notice outlined VIT's financial condition and what Sykes believed would put the company back on track. The Notice indicated that Wiesner and Hengel had conflicts of interest which contributed to the current financial maladies of VIT and that their membership on the Board should be terminated. The Notice was not well-received by the other Board members.[3]

Hengel, Iiams, and Rose met with Sykes on June 23, 2003. Hengel and Iiams told Sykes he was going to be terminated; the four men discussed a possible severance agreement. After the meeting,[4] Sykes sent an email to Hengel, Iiams, and Rose, reiterating that the discussions about a severance agreement had been preliminary and would not be definite until an agreement was signed. VIT's attorney, Jeffrey Herm, sent a draft of the proposed severance agreement to Sykes' attorney, Bob Rutt.

On July 1, 2003, the Board conducted a meeting without Sykes. After lengthy discussion, Hengel, Iiams, Muris, Wiesner, and Rose voted to terminate Sykes and remove him from the Board. The five

members elected Defendant Schlessman to fill the vacancy.

The same day, the Board sent a letter to Sykes[5] informing him that conditions had changed dramatically since his June 23, 2003, meeting with Hengel, Iiams, and Rose. The letter stated that as of June 30, 2003, VIT had negative owners' equity and was technically insolvent and that the losses for May and June were "a direct product of management failure to address serious financial issues at the end of 2002 and the beginning of 2003." The letter identified Sykes' manipulation of the reserve for product returns as the single most damaging factor in the company's financial condition. The letter also pointed out that Sykes had taken over $30,000 in excess compensation as advances against his profitability bonus, but that the company actually lost money. Consequently, the Board informed Sykes that he owed the money to the company. The Board announced that as a result of these new discoveries, they withdrew the severance offer and voted five to zero to terminate him and remove him from the Board.

On July 2, 2003, the Board drafted a memorandum to be sent to VIT Unit Holders disclosing the financial condition of VIT and explaining Sykes' termination. A copy of the draft was sent to Sykes. Revisions were made, and on July 10, 2003, the Board mailed the following version of the memorandum (the "Memorandum")[6] to

---

**3.** In his pleadings, Sykes repeatedly mentions that Board members used expletives to describe the Notice and were "furious" Sykes sent it out.

**4.** Deposition testimony reveals that Muris and Wiesner did not participate in the discussions with Sykes on June 23, 2003, and a board meeting was not conducted. Iiams testified that at that time, he and Hengel were hopeful that a severance agreement could be worked out in lieu of terminating Sykes.

**5.** The Board sent an email to Rutt asking him to deliver the letter to Sykes as the Board had been unable to reach him.

**6.** The revisions included the removal of a paragraph that directly implicated Sykes as having *instructed* the controller to use an estimated product return rate that was different than VIT's historical average. Also, the sentence, "The changes to the reserve percentages *ordered by David* were never formally reported to the Board of Managers", was replaced with, "Neither the changes to the reserve percentages nor the salary bonuses,

VIT Unit Holders.[7]

To: Vision Improvement Technologies, LLC Unit Holders

From: The Board of Managers

Date: July 2, 2003

On July 1, 2003, the Board of Managers removed David Sykes as the President of Vision Improvement Technologies. This action by the Board of Managers was deemed necessary because of a series of key operational and management deficiencies that have occurred over the course of the last 12 to 15 months.

**Develop a New Credit Source for the Company's Line of Credit**

In March of 2002, Fred Wiesner notified David that the Company would need to find a new lender to replace the line of credit to the Company provided by Fred and Lee Schlessman. This credit facility was to expire on December 15, 2002. David, however, wanted to increase the funds available under the line from $2,000,000 to over $3,000,000. Fred and Lee stated that they needed to free up their funds for other projects.

As early as June of last year, David felt confident that he would be able to replace this credit facility by year-end. Unaudited financial statements as of June 30, 2002 showed the Company with a positive net income for the year of approximately $281,000, and a projected increase of net income to over $495,000 by September 2002.

By November, however, David began to report that there were problems with the principle potential lending group. As it turns out, negotiations with the key-lending group that David was working with fell through because the net income projections provided to that group during the loan evaluation process started to come under heavy scrutiny and eventually were withdrawn. By December of last year it was clear that the Company would not be able to meet the projections that had been provided to the potential lender.

In December, it also became clear that the Company was not going to be able to find a new source for a line of credit prior to the expiration of the current credit facility. As a result, Lee Schlessman reluctantly agreed to extend this line of credit on a month-to-month basis based in part on David's statement that he was in discussions with another potential lending group. During this process the Company engaged an accounting firm to conduct an audit of the Company's financial statements as of December 31, 2002. Up to that time, the Company's financial statements had not been audited. Prior to a special meeting of the Company's Board of Mangers on March 7, 2003, David requested that Lee Schlessman extend the credit facility through December 15, 2003. When it was clear that all efforts to find a new lending source had failed and subsequent to this Board of Managers meeting, Lee Schlessman agreed to extend the credit facility through December 15, 2003.

**Decision to adjust the Reserve for Product Returns**

On February 13, 2003, the Company issued financial statements for the year ended December 31, 2002. In those financial statements, the Company reported a profit of $104,683 for the year, and

were formally reported to the Board of Managers or the Unit holders."

"Memorandum" refers to the final draft sent out to Unit Holders on July 10, 2003.

7. Because the details of the Memorandum are at issue both in terms of specific statements contained therein and in its entirety as a communication to other holders of a financial interest in the enterprise, the Court elects to set forth the document in full.

K–1 reports to Unit holders were prepared on that basis. In addition, salary bonuses had been awarded based on the apparent strong performance of the Company. The auditors began work on reviewing the financial statements in March 2003. By the beginning of April 2003, it was clear that the financial statements were seriously wrong. The problem centered on reductions in the reserve for product returns and the reserve for bad debts that had been made for the months of October, November and December 2002. In total, the Company and the Auditors have identified over $850,000 of adjustments to the December 31, 2002 financial statements. Instead of a $104,683 gain for the year the Company actually lost over $750,000. Neither the changes to the reserve percentages nor the salary bonuses, were formally reported to the Board of Managers or the Unit holders, and the Board of Managers did not become aware of the problem until the end of April. Unfortunately, because the Company was operating under the false assumption that it was profitable for last year, drastic actions to correct the significant operational loss did not begin until April 2003 when the true financial state of the Company became known. As a result of delayed actions in correcting the operational performance of the Company, the Company has projected additional operating losses in the current year of over $500,000 through June 30, 2003.

**Operational Mismanagement**

The Board held a special meeting on March 7, 2003. At that meeting the Board focused on changes that were going to need to be made to correct the operational performance of the Company. At that meeting, Chuck Hengel was elected Chairman of the Board and an Executive Committee was formed to work more closely with David. The Executive Committee was made up of the President of the Company, Chuck Hengel and Mike Iiams.

The second operations review meeting that Chuck held was on April 1, 2003. At that meeting, decisions were made to bring the spiraling cost structure of VIT under control. Chuck believed that the Company could be run successfully with less then [sic] 20 full time employees and at that time the Company had 58 full time employees. The monthly fixed operating costs for the Company had grown to over $250,000 per month. In performing a departmental walk through, it became clear that there were no operational or managerial controls in place to manage each department. A project was begun to immediately reduce the monthly fixed operating costs of the Company from over $250,000 to less the [sic] $100,000.

**Boards Decision to Remove David**

As a result of the problems noted above, the Board of Managers voted on July 1, 2003 to immediately remove David Sykes as the President of the Company. The Vote was 5 in favor of removal, i.e., all Managers other than David. Additionally, Unit holders owning 70.22% of the Company's outstanding shares have voted through a written consent to remove David as a member of the Board of Managers.

The Board of Managers has also endorsed the following actions in an effort to stabilize the Company.

1. Gary Korf has been appointed as the interim President. Gary joined the Company on March 1, 2003 as the Chief Financial Office [sic]. Gary has a strong background in finance and accounting as well as managing turnaround situations. Gary is reporting directly to the Executive Committee.

2. The Executive Committee has developed an operations budget for the

months of July, August and September of 2003. For the Company to succeed, we need to be profitable in each of these months.

3. The management team has begun working with each major supplier and contractor to reduce the cost of every part of the business.

4. Head count will be reduced from a high of 58 full time employees to 15 by July 7, 2003.

5. Lee Schlessman has been appointed as a Manager of the Company to fill the vacancy on the Board of Managers.

David played a key role in helping to start the Company, but for the Company to succeed, changes must be made in the way the Company is managed. It is unfortunate that the Company is in this position and that one of the founders of the Company must leave.

Currently, the company [sic] is on the brink of insolvency. Our owner's equity is negative and the company [sic] has no room for error. We are aggressively pursuing every savings, but may need to explore another round of capitalization if we can achieve profits over the next 90 days. The Board cannot guarantee that its changes will salvage the Company, but the Company will focus on bringing spending under control in all areas, and is committed to communicate to each of you as we navigate through this process.

On August 13, 2003, Rutt sent Herms a letter, formally rejecting the latest proposed severance agreement. Rutt informed Herms that it was not worthwhile to continue exchanging drafts. He explained that although Sykes had initially been willing to discuss a settlement, Sykes had reconsidered his position based on the circumstances of his termination and the manner in which he was represented to the Unit Holders.

## III. PROCEDURAL HISTORY

On September 22, 2003, Sykes filed the present action, asserting claims for Defamation and Intentional Interference with Contract against all Defendants, and a claim for Fraudulent Misrepresentation against Defendants Hengel and Iiams. Sykes' Complaint alleges the Defendants made false statements regarding the circumstances of his termination and wrongfully accused him of mismanagement in the Memorandum. Sykes maintains that the true basis of his termination was pointing out certain conflicts of interest.

On December 5, 2003, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(7). Defendants argued that VIT was a necessary and indispensable party under Federal Rule of Civil Procedure 19 and that Sykes failed to join VIT because its presence would have destroyed diversity. The Court denied the motion.

On February 7, 2005, Defendants filed the present motions for summary judgment, arguing Sykes' claim for defamation must be dismissed as to all Defendants for the following reasons: (1) the Memorandum is subject to qualified privilege which was not exceeded; (2) no statement in the Memorandum is capable of defamatory meaning; (3) no statement in the Memorandum constitutes libel per se nor can Plaintiff establish a claim of libel per quod; and (4) Defendants cannot be held individually accountable for libel based on their position at VIT. Defendants also argue Sykes' intentional interference with contract claim must be dismissed because they acted within the scope of qualified privilege as owners/managers of VIT in terminating Sykes' contract and they did not improperly interfere with his employment contract. Defendants Hengel and Iiams additionally argue that the claim for fraudulent misrepresentation against them

must be dismissed because Sykes cannot establish the elements of such a claim. Sykes resists the motions as to all Defendants.

## IV. STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)).

"To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case on which it has the burden of proof at trial." *Cont'l Grain Co. v. Frank Seitzinger Storage,* 837 F.2d 836, 838 (8th Cir.1988). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

The court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Niagara of Wis. Paper Corp. v. Paper Indus. Union–Mgmt. Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986). "'On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.'" *Matushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Econ. Housing Co. v. Cont'l Forest Prods., Inc.,* 757 F.2d 200, 203 (8th Cir.1985). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. On the other hand, "[w]hen a motion for summary judgment is made and properly supported, the nonmoving party may not rely on bare allegations but must set forth specific facts showing that there is a genuine issue for trial." *LeBus v. Northwestern Mut. Life Ins. Co.,* 55 F.3d 1374, 1376 (8th Cir.1995).

## V. DISCUSSION

Defendants argue the claims for defamation and intentional interference with contract must be dismissed as a matter of law. Defendants Hengel and Iiams also argue the claims for fraudulent misrepresentation must be dismissed. Plaintiff resists the motions, arguing there is sufficient evidence to sustain all claims.

### A. Defamation

Defendants argue the defamation claim must be dismissed because Sykes is unable to present a prima facie case that the Memorandum is defamatory.[8] Specifically,

---

8. Sykes concedes that the defamation claim is based solely on the Memorandum sent to Unit

Defendants argue (1) the Memorandum does not contain anything that is capable of a defamatory meaning; (2) the Memorandum does not constitute libel per se; and (3) Sykes cannot show actual damage to his reputation to sustain a claim of libel per quod. Defendants also assert (1) they are protected by a qualified privilege, and (2) Sykes cannot establish the extent to which the Defendants specifically authorized, directed, or participated in making or publishing the statements made in the Memorandum. Plaintiff resists the motion, arguing generally he has produced more than sufficient evidence to establish his claim of defamation.

"Defamation involves the publication of written or oral statements which tend to injure a person's reputation and good name." *Kerndt v. Rolling Hills Nat'l Bank*, 558 N.W.2d 410, 418 (Iowa 1997). To prove defamation, ordinarily the plaintiff must show the statements "were made with malice, were false, and caused damage." *Id.* Defamation involves the twin torts of libel and slander. *Theisen v. Covenant Med. Ctr.*, 636 N.W.2d 74, 83 (Iowa 2001) (citing *Lara v. Thomas*, 512 N.W.2d 777, 785 (1994)). Sykes alleges the Defendants libeled him by making false statements about him in the Memorandum.

■ To prove a prima facie case of libel, a plaintiff must show (1) Defendants published a statement; (2) the statement was defamatory; (3) the statement was "of and concerning" the plaintiff; and (4) the statement resulted in injury to the plaintiff. *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998). There are two types of libel: libel per se and libel per quod. *Id.*

■ "An attack on the integrity and moral character of a party is libelous per se." *Vinson v. Linn–Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115–16 (Iowa 1984).

"If a statement is clear and unambiguous, the issue of whether the statement is libelous per se is for the court. If the court determines a statement is libelous per se as a matter of law, the burden shifts to the defendant to prove the statement was used and understood in a different sense." *Kiesau v. Bantz*, 686 N.W.2d 164, 175 (Iowa 2004) (citations omitted).

> In determining whether language is libelous per se, it must be viewed stripped of any pleaded innuendo. The meaning of the phrase 'per se' is 'taken alone, in itself, by itself.' Words which are libelous per se do not need an innuendo, and, conversely, words which need an innuendo are not libelous per se.

*Shaw Cleaners & Dyers v. Des Moines Dress Club*, 215 Iowa 1130, 245 N.W. 231, 233 (Iowa 1932); *Ragland v. Household Finance Corp.*, 254 Iowa 976, 119 N.W.2d 788, 790 (Iowa 1963) (citations omitted) ("The determination of whether a publication is libelous per se is for the court in the first instance. This determination is made by reference to the statements made, without reference to the defamatory sense in which plaintiff claims such statements were intended and understood."). If Defendants' action is found to be libel per se, damage is presumed. *Schlegel*, 585 N.W.2d at 222.

■ On the other hand, "[a] statement is libelous per quod if it is necessary to refer to facts or circumstances beyond the words actually used to establish the defamation." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). To sustain an action for defamation based on libel per quod, a plaintiff must be able to prove some cognizable injury, such as injury to reputation. *Kiesau v. Bantz*, 686 N.W.2d 164, 175 (Iowa 2004). In an action based on libel per quod, a plaintiff must show damage other than just hurt feelings. *Id.;*

Holders on July 10, 2003.

*Schlegel,* 585 N.W.2d at 222 ("In case of statements that are not libelous per se but libelous per quod, this means a plaintiff must first prove actual damage to reputation before the plaintiff can recover for mental anguish or hurt feelings.").

In the present case, it is undisputed that the Memorandum containing the alleged defamatory statements was "published" for purposes of establishing the first element of a defamation claim. However, Sykes must also prove that the statement was defamatory and the statement was "of and concerning" him. If the statements are libelous per se, damages are presumed; if not, Sykes must prove actual harm to his reputation.

Sykes asserts he was defamed in the Memorandum because therein he is accused of taking unauthorized compensation and intentionally manipulating the reserve rate. Defendants argue that the statements do not rise to the level of libel per se and Sykes is unable to prove actual damage which precludes a showing of libel per quod. Defendants further argue Sykes' claims must be dismissed because they are protected by qualified privilege. Sykes counters these arguments, asserting the statements were made with ill-will and improper motive and are therefore not entitled to qualified privilege.

**1. Libel Per Se**

■ Defendants point to the allegations in Sykes' Complaint and argue that they are contrary to undisputed evidence in the case. First, they note the Memorandum was written and published by the VIT Board of Managers; therefore, Sykes cannot hold the Defendants individually liable. Second, they assert only one of the six statements Sykes alleged in his Complaint actually appears in the Memorandum; the other five statements are paraphrased or extrapolated and do not appear in the Memorandum as alleged in the Complaint.

Both of these assertions are valid. It is inescapable the Memorandum was not written by the Defendants in their individual capacities. The caption of the Memorandum lists the Board of Managers as the sender. The names of the individual members do not appear on the Memorandum. Also, the statements as alleged in Sykes' Complaint are paraphrased and do not actually appear in the Memorandum.

*Compare:*

> **Complaint:** Plaintiff failed to report relevant financial information to the Board of Managers. The Board of Managers was not aware of significant problems until April 2003.

> **Memorandum:** Neither the changes to the reserve percentages nor the salary bonuses were formally reported to the Board of Managers or the Unit holders, and the Board of Managers did not become aware of the problem until the end of April.

The Memorandum does not accuse *Sykes* of failing to report relevant financial information to the Board. It broadly states that the information was not reported and does not suggest *who*, if anyone, *failed* to report it. As for the second part of the statement, it is undisputed that the Board of Managers did not become aware of the problem until April 2003. The statement in the Memorandum advises interest holders of a communication and understanding failure in the leadership of the enterprise, without claiming this resulted from wrongdoing and without naming a wrongdoer.

*Compare:*

> **Complaint:** VIT was on the brink of insolvency due to Plaintiff's mismanagement. Spending was out of control in all areas of the Company.

> **Memorandum:** Currently, the company [sic] is on the brink of insolvency. Our owner's equity is negative and the com-

pany [sic] has no room for error. We are aggressively pursuing every savings, but may need to explore another round of capitalization if we can achieve profits over the next 90 days. The Board cannot guarantee that its changes will salvage the Company, but the Company will focus on bringing spending under control in all areas, and is committed to communicate to each of you as we navigate through this process.

The Complaint misstates the Memorandum. The Memorandum does not state that VIT is on the brink of insolvency *because of Sykes' mismanagement.* It reports the current financial status. The Memorandum summarizes where the company stands and what is being done to turn it around, again without attributing blame to anyone.

The complained of statements are true statements about the financial condition of VIT and the events that lead to those conditions. Sykes does not deny that the statements in the Memorandum are true.[9] Instead, he repeatedly complains about the "implication" of the Memorandum rather than what actually appeared in the Memorandum. Sykes attempts to impute the content of the original draft of the memorandum into the published Memorandum, despite the fact that specific references to Sykes' conduct were intentionally deleted in the final draft. Sykes' defamation claim is necessarily based on the statements made in the Memorandum and not unpublished statements contained in previous drafts.

Rather than deny the truth of the statements in the Memorandum, Sykes defends his record as President during the financial demise of VIT by asserting that he was just as much in the dark about VIT's financial status as was the rest of the Board. This defense, however, does not somehow make statements in the Memorandum false. The Memorandum lays out the reasons for Sykes' termination as "financial mismanagement." Nothing in the facts of this case, nor denied by Sykes, makes financial mismanagement a defamatory or untrue description of Sykes' leadership of VIT. In fact, Jay Marcus, Sykes' friend and former counsel for VIT, testified that Sykes was not strong on financial matters, stating, it was "not his area." This supports the allegation that Sykes was unable to oversee the financial management of VIT.

After examining each of the challenged statements, the Court finds that none of them had " 'a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.' " *Schlegel,*

---

**9.** Plaintiff submitted his own statement of material facts and did not respond to Defendants' Statement of Material Facts. Under the Local Rules, facts not denied are deemed admitted.

Local Rule 56.1(b) for the Northern and Southern Districts of Iowa provides, in pertinent part, with emphasis added:

A party resisting a motion for summary judgment must ... file ... the following:

...

A response to the statement of material facts, ... in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statement of fact ....

A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. *The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.*

*Lawyer v. City of Council Bluffs,* 361 F.3d 1099, 1104 (8th Cir.2004) (quoting LR56.1).

585 N.W.2d at 222 (citing *Johnson,* 542 N.W.2d at 510) (quoting *Prewitt v. Wilson,* 128 Iowa 198, 103 N.W. 365, 367 (1905)). Stripped of innuendo, the Memorandum does not state anything defamatory about Sykes. *Shaw Cleaners & Dyers,* 245 N.W. at 233. While a businessperson may feel bruised by statements suggesting business failure on his watch, accurate statements of the condition of the company during that period do not support a cause of action on this theory of liability. The Court finds as a matter of law, the Memorandum does not constitute libel per se. *See Suntken v. Den Ouden,* 548 N.W.2d 164, 167 (Iowa Ct.App.1996) (finding derogatory comments written on the face of three consecutive monthly alimony checks stating, $4000 child support -$2500 ex-wife unemployment; $4000 child support -$2500 breast implants, and $4000 child support - $2500 psycho, were not libel per se); *Galloway v. Zuckert,* 447 N.W.2d 553, 555 (Iowa Ct.App.1989) (finding defendant's comment in a letter sent to plaintiffs' business associates that he could not do business "on a handshake" with plaintiff, did not constitute libel per se).

### 2. Libel Per Quod

■ Looking to extrinsic evidence to attach a defamatory meaning to the Memorandum makes this an action in libel per quod. *Johnson v. Nickerson,* 542 N.W.2d at 511, requiring Plaintiff to prove some cognizable injury to his reputation, *Kiesau,* 686 N.W.2d at 175. Sykes argues he has shown damage because Fairfield is a small town and people heard he was fired for "cooking the books." As proof, Sykes submits his own deposition testimony and the deposition testimony of Marcus, who lives in Fairfield and has occasionally represented Sykes in legal matters.

The following is the portion of Marcus' testimony that Sykes offers as proof of damage to his reputation.

Q: Was there ever any concern raised by Mr. Rose that David [Sykes] had engaged in some sort of financial manipulation?

A: No.

Q: Did you consider David capable of that sort of conduct?

A: Again, what I would say is David didn't have a deep financial background, and so I don't know, *when I first heard about this lawsuit* and somebody saying essentially that David cooked the books, you know, my reaction at that time was to think that that was unlikely because I didn't think David had the capability of cooking the books because in my mind it would have required a certain, you know, financial background and experience that I did not believe he had.

Q: Do you recall who told you that David had cooked the books or words to that effect?

A: I don't. I had heard generally that the *lawsuit* involved allegations that David had manipulated return rates in some way in order to justify bonuses for he and Cliff and other employees. That was what I heard. And I don't remember who told me.

Marcus' testimony demonstrates that it was *the lawsuit not the Memorandum* that lead to the belief that Sykes "cooked the books." The "allegations" Marcus refers to were made by Sykes in his own Complaint. Marcus testified that he could not remember who told him about the allegations in the *lawsuit,* and he never mentioned or identified the Memorandum as a possible source of those statements. Even Sykes' own deposition testimony [10] fails to

---

10. As proof that his reputation was damaged *due to the Memorandum,* Sykes stated in his deposition that it was difficult for him to find

work. He testified that he was interviewed by the vice president of a company in Fairfield and was told that "he may or may not" be

draw a causal connection between purported rumors and the Memorandum. If Sykes' evidence demonstrates any damage at all, it is nothing more than hurt feelings. As such, it is not enough to defeat summary judgment in an action for libel per quod. *Kiesau,* 686 N.W.2d at 175.

### 3. Qualified Privilege

Even if Sykes was able to generate a fact question that the Memorandum was libelous, his claim fails as a matter of law because Defendants are protected by qualified privilege.

> Sometimes one is justified in communicating to others, without liability, defamatory information which would ordinarily entitle the defamed person to maintain an action for damages. The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.

*Vojak v. Jensen,* 161 N.W.2d 100, 105 (Iowa 1968) *abrogated on other grounds, Barreca v. Nickolas,* 683 N.W.2d 111, 123 (Iowa 2004).

> Under the law of defamation, a qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which that person has a right or duty, if made to a person having a corresponding interest or duty in a manner and under circumstances fairly warranted by the occasion.

*Knudsen v. Chi. & N.W. Transp. Co.,* 464 N.W.2d 439, 442 (Iowa 1990) (citing *Vinson v. Linn–Mar Cmty. Sch. Dist.,* 360 N.W.2d 108, 116–17 (Iowa 1984); *Brown v. First Nat'l Bank,* 193 N.W.2d 547, 552 (Iowa 1972)). *See also Sawheny v. Pioneer Hi–Bred Int'l, Inc.,* 93 F.3d 1401, 1410 (8th Cir.1996) ("Iowa law provides for an affirmative defense of qualified privilege, which applies when the statements are made on an appropriate occasion in good faith on a subject in which both the party making the allegedly libelous statement and the party receiving that statement have a shared interest, right, or duty.").

■ Recently, the Iowa Supreme Court clarified that in determining whether a defendant is entitled to qualified privilege, the court does *not* start by asking whether the statement "was made in good faith, published on a proper occasion, in a proper manner, and only to proper parties." *Barreca,* 683 N.W.2d at 118 (citing *Kuwik v.*

---

qualified for the position. Sykes testified that *after he informed* the vice president about his lawsuit and the circumstances of his termination from VIT, the vice president told him the company would be unable to offer him a job with the lawsuit and claims pending against him. Sykes admitted having no knowledge that the vice president ever saw the Memorandum. He also admitted that he could not name a specific job he was denied because of the Memorandum.

As additional proof of damage, Sykes testified that Unit Holders were shocked and dismayed by the information in the Memorandum. Sykes admits that those Unit Holders did not state that they thought any less of him as a result of the Memorandum. He failed to present evidence that he had any particular reputation before the Unit Holders read the Memorandum or that they thought ill of him after reading it.

Sykes' uncorroborated deposition testimony fails to prove sufficient harm to his reputation to withstand summary judgment. *See Schlegel,* 585 N.W.2d at 223 (finding the testimony of witnesses who read the false report about the plaintiff was insufficient proof of damage to reputation because plaintiff had not presented any evidence that he had "any particular reputation before the false report or that [readers] thought ill of him because of it.").

*Starmark Star Marketing and Admin., Inc.,* 156 Ill.2d 16, 188 Ill.Dec. 765, 619 N.E.2d 129, 134 (1993)) (adopting Restatement (Second) of Torts § 593–599 (1977) approach to determining whether a defendant is entitled to a qualified privilege). Instead, "a court looks only to the occasion itself for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest" in making the communication privileged. *Kuwik,* 188 Ill. Dec. 765, 619 N.E.2d at 134.

■ Once the Court has determined if the statement is protected by qualified privilege, then it must be determined whether that privilege was abused. *Barreca,* 683 N.W.2d at 118. Generally, this question is left for a jury to decide. *Id.* A qualified privilege is abused when a defamatory statement is published with actual malice. *Id.* In *Barreca v. Nickolas,* the Iowa Supreme Court discarded "the old common law wrongful motive standard, and adopt[ed]-by analogy-the *New York Times* 'knowing or reckless disregard' definition of 'actual malice' as the standard to be applied to determine whether a defendant has abused a qualified privilege." *Id.* at 121. Therefore, in Iowa, "to defeat a qualified privilege, a plaintiff must prove the defendant acted with knowing or reckless disregard of the truth of the statement." *Id.*

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.... [T]he actual malice standard require[s] a high degree of awareness of ... probable falsity.

*Id.* at 123 (quoting *Caveman Adventures UN, Ltd. v. Press–Citizen Co.,* 633 N.W.2d 757, 762 (Iowa 2001)).

"[I]n the employment context, the qualified privilege is the only effective means of preventing every termination decision from automatically becoming a case of defamation." *Theisen,* 636 N.W.2d at 85. " 'It is in the public interest that information regarding an employee's discharge be readily available to the discharged employee and to prospective employers, and we are concerned that, unless a significant privilege is recognized by the courts, employers will decline to inform employees of reasons for discharges.' " *Id.* (quoting *Lewis v. Equitable Life Assurance Soc'y of the United States,* 389 N.W.2d 876, 889–90 (Minn.1986)).

■ The purpose of the Memorandum was to inform VIT Unit Holders of VIT's financial status and to explain Sykes' termination. The Defendants had a duty to keep the Unit Holders apprised of VIT's status. Likewise, the Unit Holders had an interest in that information and the occasion created a recognized duty on the part of Defendants. Accordingly, the Court finds the communication was privileged. *See Kuwik,* 188 Ill.Dec. 765, 619 N.E.2d at 134.

Having determined the Memorandum was subject to a qualified privilege, it must next be determined whether the Defendants acted with actual malice in publishing the Memorandum. *See Barreca,* 683 N.W.2d at 123. This higher degree of awareness requires that the Defendants acted with a knowing or reckless disregard for the truth. *Id.* On a motion for summary judgment, the Court must decide as a matter of law if there is a genuine issue of material fact whether the Defendants "entertained serious doubts about the truth" of the Memorandum. *Id.*

Sykes argues he has presented sufficient evidence that a jury could find Defendants' conduct rose to the level of reckless disregard for the truth. He refers to his own

affidavit and excerpts of conversations, emails, letters, and other communications, and suggests Defendants had a *motive* to defame him in the Memorandum. He asserts that central to the issues in this case are the real reasons he was fired. He argues that Defendants knew he was unaware of VIT's financial condition before March or April of 2003, and therefore he did not mislead VIT's Board of Managers as the Memorandum suggests. He also argues that contrary to the suggestion made in the Memorandum, Fred Wiesner approved his bonus advance.

Sykes' arguments lack merit. He argued that the Board did not decide to terminate him until *after* he sent the June letters which disclosed the conflicts of interest. However, at his deposition, Sykes testified that Hengel and Iiams talked about firing him as far back as March 2003, which was before he disclosed the alleged conflicts of interest to the Unit Holders.[11] While all this evidence may tend to suggest motive, it does not tend to show that the Defendants entertained serious doubts about the truthfulness of the statements made in the Memorandum. Contrary to Sykes' assertions, nothing in the Memorandum states Sykes had knowledge of the financial condition of VIT prior to March or April of 2003, or that he misled the Board of Managers. Third, whether Wiesner did or did not "approve" Sykes' salary bonus is beside the point. The Memorandum merely states that salary bonuses were never formally reported to the Board, which nothing in this record disputes.

■ Sykes' claim also fails to attribute personal liability to the individual Defendants apart from their collective act as the Board of Managers and agents of VIT. As Sykes admits, each of the individual Defendants' involvement in the Memorandum differed. He argues that at a minimum, all of the Defendants were members of the Board on July 10, 2003, and approved the Memorandum that was mailed to the Unit Holders.

Under Iowa law, a member or manager of a limited liability corporation cannot be held individually liable merely by being a member or manager in the company. Iowa Code § 490A.603(1) ("[A] member or manager of a limited liability company is not personally liable solely by reason of being a member or manager of the limited liability company ... for any debt, obligation, or liability of the limited liability company, whether that liability or obligation arises in contract, tort, or otherwise."). However, a manager will be held personally liable for his own tortious conduct. *Id.* § 490A.603(3); *Estate of Countryman v. Farmers Co-op. Ass'n*, 679 N.W.2d 598, 603 (Iowa 2004) ("While liability of members and managers is limited, the statute clearly imposes liability when they participate in tortious conduct.").

Therefore, individual liability is determined by the acts of each individual Defendant. *Haupt v. Miller*, 514 N.W.2d 905, 909 (Iowa 1994) ("To maintain a tort claim against a director in his or her personal capacity, a plaintiff must first show that the director specifically authorized, directed or participated in the allegedly tortious conduct."). Tort liability will not be imposed on a manager "merely performing a general administrative duty." *Estate of Countryman*, 679 N.W.2d at 603.

In the present case, Sykes has not particularized the involvement of the individual Defendants. In resistance to

---

11. Sykes testified that he had mentioned the conflicts of interest to Hengel and Iiams at the beginning of 2003. However, there is no documentary evidence to support this claim, nor did Sykes testify that at that time he "disclosed" the issue to anyone else on the Board or to the Unit Holders.

this motion, Sykes offers the testimonies of Hengel and Iiams and argues they admitted drafting the Memorandum and sending copies to the other members for approval. Sykes also argues that each Defendant knew the Memorandum was going out to the Unit Holders.

This involvement does not show more than an administrative act by the Defendants and is not enough to avoid summary judgment. Even the conduct of the most culpable Defendants, Hengel and Iiams, who admit being directly involved in drafting or approving the Memorandum, does not rise to the level of actual malice since Sykes has not shown that any of the information in the Memorandum is false, or more importantly, that any of the individual Defendants "entertained serious doubts about the truth" of the Memorandum. *Barreca*, 683 N.W.2d at 123.

The Court finds that the Plaintiff failed to make out a prima facie case that the statements in the Memorandum were libel per se. Plaintiff's evidence also fails to show any cognizable injury, in order to prevent the entry of summary judgment on an action of libel per quod. Furthermore, the statements are protected by qualified privilege, and Plaintiff has not made the requisite showing that Defendants abused that privilege to defeat summary judgment. *Barreca*, 683 N.W.2d at 123.

**B. Intentional Interference with Contract**

 Sykes also claims the individual Defendants intentionally interfered with his VIT contract. To maintain an action for intentional interference with an existing contract, Plaintiffs must show that "(1) plaintiff had a contract with a third party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third party not to per-

form, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Burke v. Hawkeye Nat. Life Ins. Co.*, 474 N.W.2d 110, 114 (Iowa 1991) (citing *Nesler v. Fisher and Co., Inc.*, 452 N.W.2d 191, 196–99 (Iowa 1990)).

A party to a contract cannot be liable for tortious interference with that contract. Only a third-party, separate from the contracting parties, can be liable for such a tort. A director or officer acts as an agent of the corporation when acting in good faith to protect the interests of the corporation. When acting as an agent within the scope of the qualified privilege, there can be no tortious interference because only two parties exist; the corporation and the contracting party. However, when an officer or director acts beyond the scope of their qualified privilege, they are no longer acting as agents of the corporation and can be personally liable for their acts.

*Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 376 (Iowa 1997) (citing *Hunter v. Bd. of Tr. of Broadlawns Med. Ctr.*, 481 N.W.2d 510, 518 (Iowa 1992)).

 "Not every discharge made in breach of a contract of employment will subject the manager or director who initiated the discharge to liability in tort." *Hunter*, 481 N.W.2d at 518. The Court looks at several factors to determine if the Defendants' conduct is improper:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Id.*

Sykes asserts that he has produced sufficient evidence that the Defendants acted with such an improper purpose. Sykes argues that Hengel and Iiams were acting outside the scope of their agency and in bad faith and that the other Defendants ratified his termination through improper means and in bad faith.

### 1. Hengel and Iiams

Sykes' evidence that Hengel and Iiams acted in bad faith consists of the following: (1) they went to Fairfield on June 23, 2003 and terminated him without authority to do so; (2) they negotiated a severance agreement, and then withdrew it, claiming they just learned of the additional compensation he had been taking, but in fact, they knew about the additional compensation for months; (3) Hengel and Iiams were intent upon terminating him because he intended to raise conflicts of interest issues with the Unit Holders; in addition, both men were angry about the June 20, 2003, Notice to the Unit Holders, and they wanted to remove him before he could educate the Unit Holders about the conflicts; and (4) the Board improperly terminated him on July 1, 2003, because they did not provide him notice of the meeting.

■ Defendants argue they are entitled to qualified privilege because Sykes has not presented any evidence that they acted improperly. Defendants cite *Kabe's Restaurant, Ltd. v. Kintner,* 538 N.W.2d 281, 284 (Iowa 1995), and argue the Iowa Supreme Court found the director of a corporation was entitled to qualified privilege against a former employee's claim for tortious interference even though the director's conduct included (1) attempting to persuade the other directors to sell the business while the employee was out of the state; (2) becoming angry at the employee because the other directors rejected that plan; (3) calling a special board meeting to discuss the employee's job performance; and (4) orchestrating the employee's termination.

In the present case, Sykes has not presented evidence that any of the director's conduct rose to the level of the director in *Kabe's.* In resisting summary judgment on his defamation claim, Sykes argued that Iiams and Hengel had determined long before the June 23, 2003, meeting that he should be terminated. In arguing his interference claim, Sykes asserts that Hengel and Iiams are not entitled to qualified privilege because they improperly decided to terminate him on June 23, 2003, *after* he sent the Notice to the Unit Holders raising the conflict of interest issue. Rather than showing motive on the part of the Defendants, the evidence actually shows that Sykes did not raise the conflicts of interest issue until his job was in jeopardy in June 2003. VIT's relationships with Ithaka V and Marketing Architects were open and notorious since the company began. Sykes himself repeatedly asked Ithaka V and Marketing Architects to extend more credit to VIT. It was not until Sykes' role in VIT's financial maladies was revealed that Sykes raised the conflict of interest issue.

Hengel and Iiams had financial interests and fiduciary duties to VIT and enjoyed a qualified privilege to interfere with a contractual relationship between VIT and Sykes. *Id.* Nothing about the conduct of Hengel or Iiams rose to the level of impropriety causing them to lose that privilege. *Id.*

### 2. Muris, Schlessman, and Wiesner

Sykes argues Muris, Schlessman, and Wiesner are liable for tortiously interfering with his VIT contract because they all

voted for his termination on July 1, 2003, without even speaking to him about the return rate or his involvement in it. Sykes also argues Wiesner is liable for failing to acknowledge that he authorized the additional compensation advanced to Sykes and Rose. Like Hengel and Iiams, Muris, Schlessman, and Wiesner also had financial interest and fiduciary duties to VIT and similarly enjoy qualified privilege. Sykes has failed to show that any of the Defendants has abused that qualified privilege.

## C. Fraudulent Misrepresentation

Sykes' final claim is that Hengel and Iiams fraudulently represented that the company would enter into an agreement to pay him severance in return for his voluntary resignation. Sykes relies on taped conversations between Hengel and Iiam that he first learned about during the discovery phase of this lawsuit and argues those conversations reveal that Hengel and Iiams pursued his termination in bad faith or for reasons unrelated to the best interests of VIT.

 An action for fraudulent misrepresentation has eight essential elements the Plaintiff must demonstrate.

> (1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages.

*Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, (8th Cir.2002) (citing *Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 400 (Iowa 2001)).

 Sykes has failed to demonstrate a prima facie case of fraudulent misrepresentation. In addition to the fact that he fails to show that any representation made to him on June 23, 2003, was false, as this record indicates Defendants were proceeding at that time with the intent to enter some form of termination agreement, his own testimony demonstrates that he did not rely on those representations. Sykes sent the following email immediately following the June 23, 2003, meeting with Hengel, Iiams, and Rose:

Gentleman:

We spoke today about me stepping down as president of the company. You have indicated you are going to propose a severance package to me including mutual releases and cordiality clauses which I will consider. Please understand until this agreement is signed we are only in discussions with one another on this matter.

Sincerely,

David Sykes

As the email clearly indicates, Sykes did not rely on any agreement reached during the meeting on June 23, 2003. In addition, the proposed offer was clearly and unequivocally withdrawn by a letter of the Board sent to Sykes through his attorney on July 3, 2003. Furthermore, Sykes rejected any severance agreement in a letter dated August 13, 2003, sent to VIT by Sykes' attorney. Finally, in answer to Defendant Hengel's interrogatory, Sykes specified that his fraud damages would include $50,000 in severance pay and accumulated health insurance benefits. Sykes has not provided any evidence that he was entitled to those benefits. Sykes has failed to make a prima facie showing of fraudulent misrepresentation as against Hengel or Iiams.

## CONCLUSION

As Sykes admits in his pleadings, the central issue of this case is the real reason he was terminated. He has argued this case as though it were an action for breach of contract and wrongful termination (claims actually pending elsewhere), rather than an action for defamation, intentional interference with contract and fraudulent misrepresentation. Consequently, the evidence he has presented is not sufficient to defeat the more precise arguments in Defendants' Motions for Summary Judgment.

As set forth above, Plaintiff has failed to show that a genuine issue of material fact exists on any of his claims. Accordingly, Defendants' Motions for Summary Judgment [Clerk's No. 44, 45, 46, 47, and 48] must be **granted**. The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiff.

**IT IS SO ORDERED.**